BULLOCK v AUTOMOBILE CLUB OF MICHIGAN

Docket No. 78027. Argued March 5, 1987 (Calendar No. 19). Decided June 6, 1989. Rehearing denied 433 Mich 1201.

William J. Bullock brought an action in the Wayne Circuit Court against the Automobile Club of Michigan, challenging his termination as a commission sales representative after fourteen years with AAA and changes in his compensation. The plaintiff asserted an oral contract of employment on the basis of statements made to him when he entered AAA's employ, and claimed that the contract was breached by AAA when it changed its method of compensating commission sales representatives, adopted new production standards and disciplinary procedures, and subsequently terminated him as a sales representative for failing to meet the new standards. The court, Michael L. Stacey, J., denied AAA's motion for accelerated or summary judgment, finding that the plaintiff had stated claims on which relief could be granted and that his claims were not preëmpted by federal law. The Court of Appeals, HOOD, P.J., and BRONSON and R. L. TAHVONEN, JJ., affirmed in an opinion per curiam (Docket No. 71773). AAA appeals.

In an opinion by Justice BOYLE, joined by Justices BRICKLEY, CAVANAGH, and ARCHER, the Supreme Court held:

The plaintiff's claim is not preëmpted by the National Labor Relations Act. On the basis of the record, the defendant is not entitled to judgment as a matter of law.

The plaintiff pled an action for breach of a verbal contract of employment alleged to have arisen at the commencement of his employment. To the extent that plaintiff relies on policy manuals as the basis for his claim, In re Certified Question, 432 Mich 438 (1989), provides the guidelines for resolution on remand as to whether unilateral change in the policy manuals would be effective. However, defendant's assertion of a change in policy manuals does not, on this record, establish that there is no genuine issue of material fact as to whether the plaintiff had an enforceable contract containing a limitation on discharge.

Justice LEVIN, writing separately, stated:

The plaintiff's state law claims are not preëmpted by the National Labor Relations Act. The denial of the defendant's

motion for summary judgment was proper, the plaintiff having sufficiently stated a claim upon which relief can be granted, and the defendant having failed to demonstrate that it is entitled to judgment as a matter of law. The central question whether provisions of the sales rules manual concerning minimum production standards were in fact terms of an employment contract is one of fact; it cannot be decided on a motion for summary disposition, but must be decided by the trier of fact following a trial at which employer and employee witnesses testify.

Affirmed and remanded for further proceedings.

Justice GRIFFIN, joined by Chief Justice RILEY, concurring in part and dissenting in part, agreed that the plaintiff's claim is not preëmpted by the NLRA and that to the extent that the claim is based upon legitimate expectations grounded in the employer's written policy statements guidelines for resolution are provided by *In re Certified Question*, 432 Mich 438 (1989). The defendant's motion for summary judgment should have been granted, however. It is not reasonable to construe the alleged oral assurances by the employer as an enforceable agreement to discharge only for cause. Subjective expectancies of continued employment do not constitute a termination-for-cause contract, and the plaintiff's claim should fail as a matter of law.

Caution should be exercised in judging the viability of a breach of contract action based solely on alleged oral representations recalled years after hiring. What is needed is a modicum of realism and common sense. "Lifetime" employment contracts are extraordinary and must be expressed in clear and unequivocal terms. In this case, the allegations are insufficient as a matter of law to provide a basis for a contract of employment that was not terminable at will.

146 Mich App 711; 381 NW2d 793 (1985) affirmed.

*John W. Mason, Mary Taylor Zick,* and *Theodore S. Andris, P.C.* (by *Thomas H. Bannigan*), for the plaintiff.

*Fox & Grove* (by *Kalvin M. Grove, Steven L. Gillman,* and *Allison C. Blakley*) and *Finkel, Whitefield & Selik* (by *Robert J. Finkel*) for the defendants.

Amici Curiae:

*The Fishman Group* (by *Steven J. Fishman* and

*Malcolm D. Brown*) for Michigan State Chamber of Commerce.

*Butzel, Long, Gust, Klein & Van Zile, P.C.* (by *William M. Saxton* and *David B. Calzone*), for Greater Detroit Chamber of Commerce.

BOYLE, J.

I

This is an interlocutory appeal by the defendant from the trial court's denial of its motion for summary judgment pursuant to GCR 1963, 117.2(3),[1] alleging that there is no genuine issue of material fact and that AAA is therefore entitled to judgment as a matter of law.[2] The motion was filed before defendant's answer and before any meaningful discovery.

A motion for summary judgment filed before interrogatories and depositions are taken tests whether a cause of action has been stated, but a motion, filed after depositions and interrogatories, generally tests whether the opposing party's appropriate data raises a genuine issue as to any material fact. The function of a court in disposing of a motion for summary judgment is not to decide issues of fact, but to ascertain whether or not there is an issue of fact to be tried, resolving all

---

[1] Now MCR 2.116(C)(10).

[2] While AAA's trial court motion was brought on alternate ground of GCR 1963, 117.2(1), failure to state a claim upon which relief may be granted and GCR 1963, 117.2(3), it does not now claim that Bullock's amended complaint is technically deficient, i.e., that it fails on its face to state a claim for a breach of contract. The defendant's brief does touch upon an issue of indefiniteness which might be characterized as an attack upon the sufficiency of the complaint, but this issue was raised in neither the trial court nor in the Court of Appeals. My resolution of this matter is therefore limited to the GCR 1963, 117.2(3) question.

doubts as to the existence of a genuine issue of fact against a moving party. The fact allegations in the affidavits of the party opposing the motion must be considered to be true. Inferences must be viewed in the light most favorable to the party opposing the motion. [7 Callaghan's Michigan Pleading & Practice (2d ed), § 43.12, p 30.]

The timing of the defendant's motion, coupled with the failure of the defendant to specifically identify the issue as to which it believes there is no genuine issue of material fact,[3] places this case in an awkward posture for appellate review. Also, the trial court's analysis and that of the Court of Appeals focused on the employment-manual exception to employment at will and the question as to whether and under what circumstances an employer may alter policy manuals. However, turning first to the pleadings,[4] I find the following, common allegations:

3. That when Plaintiff entered the employ of Defendant he entered the employ of Defendant based upon [sic] the following promises:

a) That he would have a lifetime job as long as he did not steal;

b) that he would work as a commission salesman for Defendant and enjoy the benefits of a seven (7%) percent commission for sales which had been in effect for many years;

c) that if he worked hard and built up his "book of business," he would be able to earn large sums of money;

d) that if he worked hard and built up his "book of business," he could enjoy his later working years with Defendant by realizing commissions

---

[3] MCR 2.116(G)(4) now requires a specific identification of the allegedly undisputed issue.

[4] As MCR 2.116(G)(5) now makes clear, the pleadings may be considered in a motion for summary disposition on the ground of no genuine issue of material fact.

from the "book of business," which "book of business" is the accumulated memberships and policies which a commission salesman builds up over the years.

4. That for many years, Defendant worked very hard and built up his "book of business" in reliance upon the promises of Defendant and in order to enable him to enjoy the benefits of a large salary due to his individual efforts in developing his business.

In addition to these common allegations, count I of the first amended complaint asserts a breach of contract upon the basis of the following actions of AAA:

a) Eliminating commissions as a basis of compensation for sales persons;

b) establishing a "unit compensation" program whereby the commission salesmen would only get a certain amount of money per membership or policy rather than a percentage commission as had been promised to the commission salesmen when they entered the employ of Defendant;

c) establishing non-competitive rates for its product;

d) coercing Plaintiff and other similarly situated out of their employment thereby breaching the express and implied contract between Plaintiff and Defendant.

Finally, paragraph 7 of the first amended complaint alleges that these actions violated plaintiff's reasonable expectations based upon defendant's "policy statements," while paragraph 8 alleges a breach of oral promises:

That as a consequence of the breach of the express oral promises of Defendant, Plaintiff has lost a job which was guaranteed to be a lifetime

job in which he was told he would be able to earn large commissions.[5]

In support of its motion, AAA submitted two affidavits. The affidavit of Gerald Trocchio asserts facts relevant only to the issue of NLRA preëmption. On the other hand, the affidavit of Frederick A. Cruise, Vice President for Corporate Operations, states a number of facts relevant to the state law issues of this appeal. This affidavit essentially admits that plaintiff was discharged for failure to meet minimum production quotas imposed by AAA after reaching impasse in its negotiations with plaintiff's union. Of greatest significance, however, are paragraphs 6 and 7 of the affidavit of Mr. Cruise:

> 6. The Company has continuously reviewed and revised its employment policies. For example, examination of the Company's Sales Rules Manual reveals that the entire manual was revised on July 1, 1972, and that particular sections were again revised on November 1, 1973 and July 1, 1975. Def. Exh. A. Similarly, memorandum issued by the Company in 1971 and 1978 pertaining to minimum production requirements reveals that in 1971 sales personnel were required to sell a minimum of thirty memberships per month and in 1978 sales personnel were required to sell a minimum of twenty memberships. Def. Exh. B. Likewise, examination of the Company's "Employee Complaint Review Policy" reveals that it was revised in November, 1979, and again in April, 1981. Def. Exh. C.
>
> 7. Defendant's Exhibits A, B, and C to Defen-

---

[5] We are in this instance addressing a question of wrongful discharge. Plaintiff alleges that he was coerced out of his employment. Plaintiff's affidavit further alleges that he was "forced to resign." Thus, for the purposes of resolving this appeal, we accept as true that the plaintiff was discharged (as the affidavit of Mr. Cruise also sets forth).

dant's Memorandum of Law in Support of Defendant's Motion to Dismiss are true and correct copies of documents maintained by Defendant in the ordinary course of its business.

After reviewing the pleadings and affidavits, the trial court denied defendant's motion for summary judgment. Bullock submitted his own affidavit in the Court of Appeals, stating in part:

> 7. The Company never reserved the right to unilaterally change Company rules regarding grounds for demotion and/or discharge. I was clearly told by the Company at the time I was hired and many times thereafter that nobody gets fired unless they steal.
> 8. The Sales Rules Manual distributed to commission sales representatives, to the extent they [sic] contained any language regarding termination of employees, were [sic] not followed. During the fifteen (15) years I was with the Company, no sales representative was ever terminated for unsatisfactory performance, although some employees were admittedly not producing. The Company had both a direct promise and custom and practice that no one would get fired unless they stole.

The defendant's motion to strike this affidavit was denied by the Court of Appeals on February 2, 1985. The defendant has not renewed its motion in this Court.

The Court of Appeals affirmed the trial court's denial of the defendant's motion for summary judgment.[6]

II

We agree with part II of Justice LEVIN's opinion,

---

[6] *Bullock v Automobile Club of Michigan*, 146 Mich App 711; 381 NW2d 793 (1985).

concluding that plaintiff's claim is not preëmpted by the National Labor Relations Act, 29 USC 151 *et seq.* Proper resolution of the state law issues raised by the defendant requires further analysis.

III

Without identifying the nature or elements of Bullock's claim, AAA argues in support of its general assertion that no genuine issue of material fact precluded the trial court from granting its summary judgment motion. What at first blush might be oversight is undoubtedly due to a desire to preserve a position when an answer is filed, both as to the formation of the contract pled by Bullock and the existence of such a contract at the time of Bullock's discharge. The defendant's efforts to preserve these questions are sound strategy, but the pleadings and affidavits currently before us present undisputed oral promises made to Bullock at the time he entered defendant's employ. These must be deemed true.[7]

The defendant argues that a right to amend employment policies is fully consistent with the presumption of employment at will. We agree. This observation, however, is most pertinent to the plaintiff having pled in part that defendant's actions violated his reasonable expectations based on "policy statements" of the defendant, the origin and precise nature of which have not yet been identified. Bullock has also pled that the defendant's actions breached an express oral promise.

---

[7] Resolution of this matter is further complicated by the parties understandable melding of contract theory and the theory of legitimate expectations. Admittedly, the prior opinions of this Court have done little to clarify the relationship between these two theories. Cf. *Valentine v General American Credit, Inc*, 420 Mich 256, 259; 362 NW2d 628 (1984) with *Renny v Port Huron Hosp*, 427 Mich 415; 398 NW2d 327 (1986).

While the policy manual legitimate expectations analysis of *Toussaint v Blue Cross & Blue Shield of Michigan,* 408 Mich 579; 292 NW2d 880 (1980), may have in practice obscured that portion of the opinion dealing with a contract arising from an express agreement, oral or written, it is clear that the *Toussaint* majority held both that a provision of an employment contract providing that an employee shall not be discharged except for cause is legally enforceable and that the contract may be established in alternative ways. According to *Toussaint,* formation may be "either by express agreement, oral or written, *or* as a result of an employee's legitimate expectations grounded in an employer's policy statements." *Id.,* p 598 (emphasis added).

The majority in *Toussaint* carefully pointed out that the enforceability of personnel policies did not turn on whether negotiations had taken place, the parties' minds had not met on the subject, the employee knew nothing of the particulars, or that the employer could change the policies unilaterally. Policy manuals in this situation were enforceable not as express promises, in quasi contract, or because of promissory estoppel, but because the Court under its common-law authority recognized the enforceability of "a situation 'instinct with an obligation,' " *id.,* p 613, an obligation distinct from and independent of contract analysis.

In *Toussaint* and *Ebling,* the Court held that there was sufficient evidence of an *express* agreement to justify submission to a jury. *Toussaint, supra,* p 598. While the Court in *Toussaint* also held that there was sufficient evidence of Toussaint's legitimate expectations grounded in the policy manual to submit to the jury, *id.,* p 599, apart from the employment manual upon which Toussaint's legitimate expectations were based,

four members of the Court found that testimony as to the promises of Allen R. Schaedel, the defendant's treasurer, created a jury-submissible issue as to whether there was a discharge-for-cause contract.

In *Ebling,* the corporate vice president, Richard Manoogian, promised that, if anything detrimental came up between Ebling and his immediate supervisor regarding Ebling's performance, Manoogian would personally review Ebling's performance and give him a chance to "correct things." The plaintiff testified that Manoogian further promised Ebling that, if he was doing the job, he would not be discharged. *Id.,* p 626 (separate opinion of RYAN, J.). All members of the Court, Chief Justice COLEMAN, and Justices KAVANAUGH, WILLIAMS, MOODY, LEVIN, RYAN, and FITZGERALD, agreed that this testimony created a jury-submissible issue as to whether plaintiff's employment was not terminable at will but only for cause. *Id.,* pp 633-644.

To paraphrase the language in *Toussaint,* p 611, and illustrate the distinction between the alternative theories of "enforceability" there recognized, suppose that a policy manual providing for employment at will was extant at the time an employee was hired. Could it be said that such a manual, as a matter of law, precluded the enforceability of a later written contract providing "in so many words" that the employee could not be discharged except for cause? We think not. Likewise, it cannot be said that where an express agreement is alleged preceding an employment manual, the alleged promise is, as a matter of law, unenforceable.[8]

---

[8] I note, but decline to address, the defendant's argument that an oral contract of employment in this context violates the Michigan Statute of Frauds. MCL 566.132; MSA 26.922. The defendant failed to raise this issue in the trial court and the matter is therefore not

In *In re Certified Question, Bankey v Storer Broadcasting,* 432 Mich 438; 443 NW2d 112 (1989), we have today said that the obligation recognized by the policy manual leg of *Toussaint* does not preclude employers from amending employment manuals. *In re Certified Question* does not, however, do more than establish that discharge-for-cause policy provisions may be modified on the basis of "reasonable notice of the change . . . uniformly given to affected employees," issues which the defendant's affidavit understandably does not address. It does not establish that amendments to employment manuals must be construed to be modifications of a distinct, express, or implied-in-fact contract. As the pleadings and affidavits stand, Bullock alleges an oral contract for hire in which the employer limited his right to terminate, not employment at will.

It is true, as the defendant contends, that indefinite hirings have been considered to be terminable at will. 9 Williston, Contracts, § 1017, p 131. However, as recognized by both the *Toussaint* majority and dissent, this rule, properly conceived, has never been more than one of construction.[9] *Toussaint, supra,* pp 597, 650. Bullock has alleged an oral contract of employment containing a discharge-for-cause provision and the defendant's affidavits do not rebut that allegation. This allegation sets forth a claim under the holding in *Toussaint* that the express promise of the employer *apart* from the employment manual may create a jury-submissible issue.

properly before this Court. Whether the Legislature should reconsider and reformulate the statute of frauds is also a matter not properly before the Court.

[9] In this regard, both *Toussaint* and *Lynas v Maxwell Farms,* 279 Mich 684, 687; 273 NW 315 (1937), depart from the rule under which employment at will is treated as a substantive limitation on the enforcement of contracts (*post,* pp 517–518, GRIFFIN, J.).

The extent of plaintiff's reliance on policy manuals and the effect of the manuals submitted by the defendant cannot be resolved on this record. These matters may be raised on remand in light of *In re Certified Question.* However, as to plaintiff's allegation of an *oral* promise, plaintiff's pleadings, which must be deemed true, allege a breach of discharge-for-cause employment under *Toussaint.* The employment manuals submitted by the defendant, to the extent that they do not constitute unilateral modification of the policy basis of plaintiff's claim, must be seen on this record as an *offer* to modify the discharge-for-cause provision of Bullock's alleged express contract and do not entitle the defendant to summary disposition.

The determination of the effect of these manuals on Bullock's allegations must await further discovery and perhaps trial. We do not, at this point, know basic facts such as who made the alleged promises to Bullock and under what circumstances the promises were made. Nor do we know whether the policy manuals referenced in the Cruise affidavit constituted an offer of modification, and, if so, whether there is a genuine issue of fact as to whether Bullock accepted the offer.[10] Finally, we

---

[10] It also should be noted there are factors in the complaint which may bring it within the distinguishing features holding in *Ebling v Masco Corp*, separate opinion by RYAN, J., pp 633-634. It appears that Bullock was initially employed as a commission salesman whose income was derived in part from commissions paid for renewals on his book of business and that Bullock was induced to work particularly hard during the earlier years of his employment so that he might later enjoy the fruit of his efforts derived from renewal commissions. Bullock's contract was similar to that of Ebling in which continued employment was necessary to give the employee the full benefit of a stock option plan. We, of course, express no opinion on this question.

Facts similar to these have fueled the growing body of case law extending the duty of good faith to discharges under employment-at-will contracts. See, e.g., *Fortune v Nat'l Cash Register Co*, 373 Mass 96; 364 NE2d 1251 (1977); *Maddaloni v Western Mass Bus Lines, Inc*, 386 Mass 877; 438 NE2d 351 (1982); *Cook v Alexander & Alexander,*

do not know at this point whether the alleged promise of "a lifetime job as long as he did not steal" was either intended by the defendant or understood by Bullock in the literal sense which disturbs the dissent.[11]

In sum, to the extent that plaintiff relies on policy manuals as the basis for his claim, *In re Certified Question* provides the guidelines for resolution on remand as to whether unilateral change in the policy manuals would be effective. However, defendant's assertion of a change in policy manuals does not, on this record, establish that there is no genuine issue of material fact as to whether the plaintiff had an enforceable contract containing a

40 Conn Supp 246; 488 A2d 1295 (1985); *K mart Corp v Ponsock,* 732 P2d 1365 (Nev, 1987); *Foley v Interactive Data Corp,* 47 Cal 3d 654; 254 Cal Rptr 211; 765 P2d 373 (1988).

As one commentator has observed:

> Although not all courts have recognized exceptions or limitations to the employment at will doctrine, courts in thirty-two states have adopted public policy exceptions, eleven states have applied the covenant of good faith and fair dealing, and twenty-nine states have used employee handbooks to find contractual limitations on terminations. A total of thirty-nine states now employ one or more theories to qualify the employment at will doctrine. [Summers, *Labor law as the century turns: A changing of the guard,* 67 Neb L R 7, 13-14 (1988).]

[11] It is perhaps the isolation in which this promise has been reviewed in the partial concurrence and partial dissent of Justice GRIFFIN which caused such a stir. As Professor Corbin has explained, however:

> There is no doubt that indefiniteness of terms of an agreement is a factor that will be given some weight, even though standing alone it would not be decisive. It may be the factor that is chiefly stressed in a judicial opinion, in a case that involved elements of unfairness or fraud or disloyalty. Where no such elements exist, and the employee has so greatly changed his position that a more limited remedy is inadequate, the court is more ready to fill gaps by liberal interpretation and by inferences from the performances already rendered. [1 Corbin, Contracts, § 96, p 422.]

limitation on discharge. The defendant is not entitled to judgment as a matter of law.

## IV

### CONCLUSION

Bullock has pled an action for a breach of an oral contract of employment alleged to have arisen at the commencement of his employment. The defendant's affidavits in regard to its policy manuals do not entitle the defendant to judgment under GCR 1963, 117.2(3).

We affirm the decisions of the trial court and the Court of Appeals denying the defendant's motion for summary judgment and remand the case to the trial court for further proceedings consistent with this opinion and *In re Certified Question.*[12] We do not retain jurisdiction.

BRICKLEY, CAVANAGH, and ARCHER, JJ., concurred with BOYLE, J.

LEVIN, J. William J. Bullock claims that the Automobile Club of Michigan breached an oral contract of employment when it discharged him for failing to achieve production standards set forth in a revision of its sales rules manual. AAA asserts that it had the right to revise minimum production standards, although the right to do so was not expressly reserved in the manual, and that, in all events, Bullock's claim is preëmpted by the National Labor Relations Act.

The instant case was argued together with *In re Certified Question, Bankey v Storer Broadcasting,*

[12] We recognize the limited nature of this response to an invitation to address far broader questions regarding modification of the oral promise recognized in *Toussaint.* If we are to exercise that authority responsibly, we must proceed carefully on a record developed by adversaries where much more than what is now before us is known.

432 Mich 438; 443 NW2d 112 (1989), also decided today. In *In re Certified Question*, this Court holds that an employer may, without an express reservation of the right to do so, unilaterally change a discharge-for-cause written policy statement to a terminable-at-will policy.

In *In re Certified Question*, there was no dispute concerning the terms of the employment contract. The stated question posited that the terms of the employee manual had become terms of the employment contract. The dispute was whether the employer could unilaterally change a policy stated in the employee's manual that had become a term of the employment contract. Here, the central question is what were the terms of the employment contract, specifically, whether the provisions of the sales rules manual concerning minimum production standards were terms of the employment contract, as claimed by AAA, or whether, as claimed by Bullock, the provisions of the sales rules manual were inconsistent with an orally agreed upon employment contract and not terms of the contract.

A majority of the Court agrees with the circuit judge and the Court of Appeals[1] that the question what were the terms of the employment contract should not have been decided on the motion for summary disposition. The question should be decided by the trier of fact following a trial at which employer and employee witnesses testify.

We all agree with the circuit judge and the Court of Appeals that Bullock's claim is not preempted by the National Labor Relations Act. The National Labor Relations Act does not address the state law claims set forth in Bullock's complaint. Bullock's claims do not concern conduct

[1] *Bullock v Auto Club of Michigan*, 146 Mich App 711; 381 NW2d 793 (1985).

Congress intended to leave unregulated by state law. Although a union was certified, no collection bargaining agreement was entered into between AAA and the union. The state law claims of the members of the union were not instantly extinguished when the union was certified, before negotiations for a collective bargaining agreement began and without regard to whether a collective bargaining agreement was entered into.

I

AAA terminated Bullock's employment as a commission sales representative after employing him in that capacity for nearly fourteen years. Bullock remained at AAA working as a salaried sales employee, a member advisor. Bullock commenced this action alleging that the termination of his employment as a commission sales representative and changes in his compensation breached his oral contract of employment. Bullock based his claim of an oral employment contract on statements assertedly made to him when he was employed as a sales representative with AAA in May, 1968. According to Bullock, he was told that (1) he would have a lifetime job with AAA as long as he did not steal; (2) he could work as a commission sales representative for AAA and continue to receive a seven percent commission for insurance sales; and (3) if he worked hard and built up his "book of business," he would enjoy his later working years by realizing substantial commissions from that "book of business."

In 1978, AAA changed its method of compensation for commission sales representatives, substituting a "unit compensation plan" for the straight seven percent commission system. In September, 1981, AAA adopted production standards and a

disciplinary procedure to be followed when sales representatives failed to meet the new standards. In February, 1982, Bullock was terminated as a commission sales representative after failing to meet AAA production standards.[2]

Bullock contends that the production standards were not imposed to increase productivity, but were part of a scheme to "eliminate senior and older commission sales representatives from the staff" because the standards did not take "into consideration the fact that the senior commission salesmen had to spend disproportionate amounts of their time in servicing existing accounts, rather than seeking out new business." Bullock asserts that AAA decided to eliminate senior commission salesmen and replace them with "younger, lower paid salaried personnel." In addition to pleading a claim for breach of contract, Bullock also claimed that AAA is liable for unjust enrichment,[3] conversion,[4] age discrimination,[5] and negligent evaluation.[6]

---

[2] In the termination letter, AAA offered Bullock a salaried position as a "member advisor."

[3] Bullock claims that in taking back his "book of business" when he was terminated as a sales representative, AAA was unjustly enriched.

[4] Bullock claims he had a property right in his "book of business" and that property right was taken from him as a result of wrongful acts of AAA.

Bullock claims that he was promised a lifetime job as long as he did not steal and commissions of seven percent of the "book of business" that he might build up, and "that if he worked hard and built up his 'book of business,' he could enjoy his later working years with [AAA] by realizing commissions from the 'book of business,' which 'book of business' is the accumulated memberships and policies which a commission salesman builds up over the years."

In *Follmer, Rudzewicz & Co v Kosco*, 420 Mich 394; 362 NW2d 676 (1984), this Court recognized that an employer has a property interest in insurance renewals that it may protect by contract. See also *Lichnovsky v Ziebart Int'l*, 414 Mich 228; 324 NW2d 732 (1982). Bullock claims a property interest in the renewals arising as a result of contract.

[5] Bullock alleges that the production standards were designed to displace senior and older commission salespersons.

[6] Bullock alleges that AAA breached a duty to perform accurate, reasonable and fair performance evaluations.

AAA did not answer Bullock's complaint. AAA moved for accelerated judgment, claiming that Bullock's cause of action was preëmpted by federal labor law and, therefore, a state court lacked jurisdiction to hear the matter.[7] AAA alternatively

---

[7] AAA's motion for accelerated judgment, or in the alternative summary judgment, sought judgment in its favor pursuant to GCR 1963, 116 and 117, on the grounds that *"first,* the Court lacks jurisdiction of the subject matter; *second,* Plaintiff has failed to state a claim upon which relief can be granted; and, *third,* there is no genuine issue as to any material fact and that Defendants are entitled to judgment as a matter of law . . . ."

The memorandum of law in support of the motion contained the following headings:

A. The Complaint Must Be Dismissed In Accordance With Principles Of Federal Preëmption.

1. Plaintiff's *Toussaint* Claim Is Preëmpted Because It Seeks To Disrupt The Balance Of Economic Power Under Federal Law.

a. States Are Precluded From Interfering With The Policy Of Free Collective Bargaining Established By Federal Law.

b. The Employer's Federal Right To Make A Good Faith Unilateral Change Cannot Be Infringed By A State Cause Of Action.

c. A Law Of General Applicability Is Nonetheless Preëmpted If Its Application Would Frustrate The Federal Scheme.

2. Plaintiff's *Toussaint* Claim Is Also Preëmpted Because It Seeks To Regulate Conduct Exclusively Within The Unfair Labor Practice Jurisdiction Of The NLRB.

B. The Complaint Must Be Dismissed Because The Supreme Court Of Michigan Never Intended *Toussaint* To Apply In A Union Context.

C. The Complaint Must Be Dismissed Because *Toussaint* Expressly Protects An Employer's Right To Make A Unilateral Change.

D. The Complaint Must Be Dismissed Because The Company Never Breached Plaintiff's Alleged Rights Under *Toussaint.*

Affidavits of two AAA employees were attached. One, who served on AAA's bargaining team in the negotiations with the Michigan AAA Sales Association, described the negotiating process, the impasse, and the implementation of production standards contained in AAA's final offer. The other, referred to the implementation of the final offer, stated that seventy-five of the company's 570 sales personnel, including Bullock, failed to meet the new minimum production standards,

moved for summary judgment, claiming that Bullock had failed to state a claim on which relief could be granted and that AAA was entitled to judgment because (1) *Toussaint v Blue Cross & Blue Shield,* 408 Mich 579; 292 NW2d 880 (1980), is not applicable to unionized employees, (2) *Toussaint* provided that employers may make unilateral policy changes, and (3) under the common-law requirements of *Toussaint,* AAA did not breach any of Bullock's contract rights. The basis of decision proposed in the dissenting opinion was not stated in AAA's motion or supporting brief.

The circuit judge found that Bullock's claims were not preëmpted by federal law and denied AAA's motion for accelerated judgment. He also rejected the arguments made in support of AAA's motion for summary judgment. The Court of Appeals affirmed.[8]

AAA raises the following questions in this Court:

1. May an employer revise its personnel practices, including required standards of job performance, notwithstanding that some employees might not have been aware that the policies previously in effect were subject to revision?

---

were terminated, and were offered alternative employment as salaried employee advisors which they all accepted. This affidavit further states that Bullock received all commissions that were due him and describes revisions in its employment policies referred to in the text following n 27. A copy of the sales rules manual as revised July 1, 1972, was also attached.

Plaintiff's complaint alleged breach of contract. An amended complaint was filed after AAA's motion for accelerated and summary judgment was filed that added counts for unjust enrichment, conversion, age discrimination, and negligent evaluation. The allegations describing the alleged contract in the amended complaint are, however, identical with those in the original complaint. AAA did not file an amended motion or change its arguments after the filing of the amended complaint. The circuit judge delivered his opinion immediately after the amended complaint was filed, but the order denying the motion was not entered for almost two months.

[8] *Bullock v Automobile Club of Michigan,* 146 Mich App 711; 381 NW2d 793 (1985).

2. Do the undisputed facts demonstrate, as a matter of law, that Bullock knew or should have known that AAA's personnel policies were subject to revision?

3. May employees—on whose behalf a union has negotiated wages, hours and working conditions— invoke preunion, individual contract rights to supersede the lawful results of the negotiations?

A majority of the Court affirms the Court of Appeals and the circuit court denials of AAA's motion for accelerated and summary judgment.

II

We first address the question whether the circuit court lacked jurisdiction of the subject matter because Bullock's state law claims were preëmpted by the NLRA.

A

When Bullock was hired in 1968, AAA's sales employees were not represented by a union. On February 7, 1978, the Michigan AAA Sales Association was certified as the exclusive bargaining representative for AAA's commission sales representatives. Although AAA and the union met numerous times to negotiate a collective bargaining agreement, they failed to reach an agreement because the union would not accede to AAA's demand that the agreement contain minimum production standards. AAA's final offer included a proposal for minimum production standards. On August 5, 1981, the union rejected this final offer at a general meeting of its membership, thus creating an impasse in the bargaining. After further attempts to negotiate a collective bargaining agreement failed, the union was decertified in October, 1982.

Aaa implemented the proposed production standards on September 1, 1981. Accompanying the production standards was a disciplinary procedure providing that a sales representative who did not meet a production standard during any month would receive an oral warning. If the representative failed to meet the standards for four successive months, he would receive a written warning, probation, and would ultimately be subject to demotion or termination.

Aaa contends that Bullock's termination was lawful because he was discharged for failing to meet Aaa's production standards after Aaa followed the steps outlined in its disciplinary procedure. Aaa and the amicus curiae, Michigan State Chamber of Commerce, argue that Bullock's claim is preëmpted for two reasons: (1) Aaa's right to impose production standards is within the exclusive jurisdiction of the National Labor Relations Board, and (2) Bullock's state law claims disrupt the collective bargaining process by attempting to deprive Aaa of an economic weapon of self-help, namely, the right to implement a final offer after an impasse.

Bullock responds that state courts retain jurisdiction of state law claims where the parties have not entered into a collective bargaining agreement and where the litigation does not concern federal interests, but rather discrete state interests.

B

The United States Supreme Court has developed two doctrines for determining whether a state claim is preëmpted by the NLRA.[9] One doctrine, set

[9] *Golden State Transit Corp v Los Angeles,* 475 US 608, 613; 106 S Ct 1395; 89 L Ed 2d 616 (1986); *Metropolitan Life Ins Co v Massachusetts,* 471 US 724; 105 S Ct 2380; 85 L Ed 2d 728 (1985).

forth in *San Diego Building Trades Council v Garmon,* 359 US 236, 245; 79 S Ct 773; 3 L Ed 2d 775 (1959), established that state regulations and causes of action are preëmpted when they concern an activity that is actually or arguably protected or prohibited by the NLRA. The state claim may survive, however, if the conduct at issue "is of only peripheral concern to the federal law or touches interests so deeply rooted in local feeling and responsibility . . . ."[10] The court balances the state's interest in regulating or promoting a remedy for the conduct against the intrusion in the NLRB's jurisdiction and the risk that the state's determination will be inconsistent with provisions of the NLRA.

The second preëmption doctrine originated in *Machinists v Wisconsin Employment Relations Comm,* 427 US 132; 96 S Ct 2548; 49 L Ed 2d 396 (1976), and was "designed, at least initially, to govern pre-emption questions that arose concerning activity that was neither arguably protected from employer interference by §§ 7 and 8(a)(1) of the NLRA, nor arguably prohibited as an unfair labor practice by § 8(b) of that Act."[11] *Machinists* preëmption prohibits state regulation and state law claims involving conduct that Congress intended to remain unregulated, namely, the use of

---

Another line of federal preëmption, preëmption under § 301(a) of the Labor Management Relations Act of 1947, 61 Stat 156; 29 USC 185(a), is not pertinent because the interpretation of a collective bargaining agreement is not involved. *Lingle v Norge Div of Magic Chef, Inc,* 486 US 399, —; 108 S Ct 1877, 1880-1881; 100 L Ed 2d 410 (1988). *Teamsters v Lucas Flour Co,* 369 US 95; 82 S Ct 571; 7 L Ed 2d 593 (1962). AAA's reliance on *Nat'l Metalcrafters, Div of Keystone v McNeil,* 784 F2d 817 (CA 7, 1986), and *Serrano v Jones & Laughlin Steel Co,* 790 F2d 1279 (CA 6, 1986), is misplaced as both cases involve § 301 preëmption.

[10] *Belknap, Inc v Hale,* 463 US 491, 498; 103 S Ct 3172; 77 L Ed 2d 798 (1983); *San Diego Building Trades Council v Garmon,* 359 US 236, 243-244; 79 S Ct 773; 3 L Ed 2d 775 (1959).

[11] *Metropolitan Life Ins Co v Massachusetts,* n 9 *supra,* p 749.

economic weapons of self-help by labor and management.[12]

AAA and the amicus curiae, MSCC, argue that Bullock's action is preëmpted under both the *Garmon* and *Machinists* branches of NLRA preëmption doctrine.

C

We first examine Bullock's state law claims in light of the *Garmon* doctrine of preëmption. *Garmon* provides:

> When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted.[13]

Section 8(a)(5) states that it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees . . . ."[14] Section 8(d) defines the duty "to bargain collectively" as the duty to "meet . . . and confer in good faith with respect to wages, hours, and other terms and conditions of employment . . . ."[15] Although an employer's unilateral change in the conditions of employment then *under* negotiation is a violation of § 8(a)(5), an employer is generally permitted to make such changes following an impasse in negotiations.[16]

AAA and MSCC assert that implementation of

---

[12] *Id.*

[13] *Garmon, supra,* p 245.

[14] 29 USC 158(a)(5).

[15] 29 USC 158(d).

[16] See *NLRB v Katz,* 369 US 736, 743; 82 S Ct 1107; 8 L Ed 2d 230 (1962).

production standards after an impasse is at least arguably protected by § 8. Bullock contends, however, that state law claims are not within the scope of § 7 or § 8. According to Bullock, the instant action does not require that this Court consider AAA's imposition of new standards of production;[17] rather, the action concerns oral statements made to Bullock that allegedly gave rise to a contract of employment.

The United States Supreme Court declared in *Sears, Roebuck & Co v Carpenters,* 436 US 180, 197; 98 S Ct 1745; 56 L Ed 2d 209 (1978), that preëmption analysis should focus on whether the state court controversy is identical with or different from that which *could* have been presented to the NLRB:

> The critical inquiry, therefore, is not whether the State is enforcing a law relating specifically to labor relations or one of general application but *whether the controversy presented to the state court is identical to . . . or different from . . . that which could have been, but was not, presented to the Labor Board.* For it is only in the former situation that a state court's exercise of jurisdiction necessarily involves a risk of interference with the unfair labor practice jurisdiction of the Board which the arguably prohibited branch of the *Garmon* doctrine was designed to avoid. [Emphasis added.]

In *Belknap, Inc v Hale,* 463 US 491; 103 S Ct 3172; 77 L Ed 2d 798 (1983), the United States Supreme Court ruled that employees hired to replace striking workers could pursue causes of action for misrepresentation and breach of contract

---

[17] Bullock's amended complaint eliminates an allegation in his original complaint that the imposition of production standards (quotas) by AAA constituted a breach of contract.

in state court.[18] The Court found preëmption to be inappropriate because, among other reasons, an action before the NLRB could not address or in any way remedy the wrongs suffered by the plaintiffs.

Following the *Belknap* and *Sears* analyses, we conclude that the substance of Bullock's state law claims significantly differ from any claims he could have presented to the NLRB. The state law claims require a determination of what were the terms of Bullock's employment contract and whether certain actions by AAA[19] breached that contract. The NLRB, on the other hand, is concerned with the *process* of bargaining. The board would decide whether an impasse in bargaining had occurred before AAA's implementation of the production standards contained in its last offer at the bargaining table. The NLRB would not look at any particular provision of an employment contract in evaluating the question whether an impasse had occurred.[20]

Bullock's state law claims could not have been presented to the NLRB because the NLRB would not and could not determine Bullock's state law claims. The NLRB would not have provided a rem-

[18] In recent years, *Garmon* has been applied flexibly, "especially where the State has a substantial interest in regulation of the conduct at issue and the State's interest is one that does not threaten undue interference with the federal regulatory scheme." *Farmer v Carpenters,* 430 US 290, 302; 97 S Ct 1056; 51 L Ed 2d 338 (1977). The United States Supreme Court has expanded the exception to *Garmon* preëmption to provide state courts with jurisdiction in actions involving "interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." *Garmon, supra,* p 244.

[19] See n 17.

[20] AAA relies on *UA 198 Health & Welfare, Education & Pension Funds v Rester Refrigeration Service,* 790 F2d 423, 426 (CA 5, 1986), where the United States Court of Appeals for the Fifth Circuit held that primary jurisdiction of the matter belonged to the NLRB because the "key issue on the merits is whether the parties have *reached an impasse."* (Emphasis added.)

edy for his state law claims and, therefore, would not have provided a remedy for his discharge from AAA. Bullock's state law claims and any claim he could bring before the NLRB are not identical but rather separate and discrete. Allowing Bullock to proceed on his state law claims poses no risk of interference with the jurisdiction of the NLRB.

### D

AAA and MSCC also contend that Bullock's claims are preëmpted under the *Machinists* rationale because maintenance of a state law action would thwart the effective implementation of the NLRA. They argue that an employer's right to impose its final offer when the parties fail to reach a collective bargaining agreement is one of the employer's most powerful economic self-help weapons. They contend that Bullock's action threatens to interfere with the collective bargaining process in a way Congress did not intend.

*Machinists* preëmption becomes relevant where the action lies outside the reach of *Garmon.* It "protects against state interference with policies implicated by the structure of the [NLRA] itself, by pre-empting state law and state causes of action concerning conduct that Congress intended to be unregulated." *Metropolitan Life Ins Co v Massachusetts,* 471 US 724, 749; 105 S Ct 2380; 85 L Ed 2d 728 (1985). Under the *Machinists* doctrine,

> Whether self-help economic activities are employed by employer or union, the crucial inquiry regarding pre-emption is the same: whether "the exercise of plenary state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the Act's processes."[21]

---

[21] *Machinists, supra,* pp 147-148.

Bullock's action is essentially an ordinary contract action, routinely heard in state court. The United States Supreme Court observed in *Belknap*:

> The interests of the Board and the NLRA, on the one hand, and the interest of the State in providing a remedy to its citizens for breach of contract, on the other, are "discrete" concerns . . . . We see no basis for holding that permitting the contract cause of action will conflict with the rights of either the strikers or the employer or would frustrate any policy of the federal labor laws. [*Id.*, p 512.]

E

The MSCC maintains that once a union is certified, the terms and conditions of employment are covered exclusively by federal labor law, not state law. Because Bullock was discharged for failure to meet the production standards, the MSCC reasons that the circumstances surrounding the implementation of those standards is central to Bullock's state law claims and necessitates a finding of preëmption. We disagree.

The selection of a union representative did not instantly extinguish Bullock's state law claims or contract rights. Employees would hesitate to cast their lot with a union if they were deemed to have forgiven their common-law contract and other claims when a collective bargaining agent was certified without regard to whether a collective bargaining agreement is entered into. The United States Supreme Court, in *J I Case Co v NLRB,* 321 US 332, 336-337; 64 S Ct 576; 88 L Ed 762 (1944), said:

> Care has been taken in the opinions of the Court to reserve a field for the individual contract, even

in industries covered by the National Labor Rela-
tions Act, not merely as an act or evidence of
hiring, but also in the sense of a completely indi-
vidually bargained contract setting out terms of
employment, because there are circumstances in
which it may legally be used, in fact, in which
there is no alternative. Without limiting the possi-
bilities, instances such as the following will occur:
Men may continue work after a collective agree-
ment expires and, despite negotiation in good
faith, *the negotiation may be deadlocked or de-
layed; in the interim express or implied individual
agreements may be held to govern.* [Emphasis
added.]

When a collective bargaining agreement expires
and the parties are unable to agree on the terms
of a new agreement, an employer may implement
its final offer after impasse. In the instant case,
however, no collective bargaining agreement was
ever agreed upon and the union was decertified,
albeit after Bullock was discharged.[22] Where no
agreement is reached, enforcement pursuant to
state law of preëxisting state law contract rights
and other state law claims does not "frustrate any
policy of the federal labor laws." *Belknap, supra,* p
512.

In sum, we conclude that state court jurisdiction
of Bullock's state law claims is not preëmpted
under the *Garmon* branch or the *Machinists*
branch of federal preëmption doctrine. The circuit
court has jurisdiction of the subject matter.

III

AAA claims that it is entitled to summary judg-

---

[22] We also reject AAA's assertion that employees who have been
unionized cannot bring a *Toussaint*-based cause of action. See *Lingle,*
n 9 *supra.* As the circuit judge correctly noted, *Toussaint* made no
exception for unionized employees.

ment because Bullock failed to state a claim on which relief can be granted and there is no genuine issue of material fact.

A

A motion for summary judgment for failure to state a claim "seeks to test the genuineness of a claim by challenging the *legal* adequacy of the pleadings."[23] The standard in evaluating such a motion "is whether plaintiff's claim, on the pleadings, is so clearly unenforceable as a matter of law that no factual development can possibly justify a right to recovery."[24] In assessing the motion, the trial court "does not act as a factfinder, nor does the court attempt to probe the parties' ability to prove their allegations."[25] The court thus "accepts as true all well-pleaded facts."[26]

*Toussaint* held enforceable contractual rights grounded in an employee's legitimate expectations generated by an employer's statements of policy.[27]

[23] *Abel v Eli Lilly & Co,* 418 Mich 311, 323; 343 NW2d 164 (1984), cert den 469 US 833 (1984).

[24] *Id.,* p 323.

[25] *Id.,* p 324.

[26] *Id.*

[27] Contrary to the argument of amicus curiae, the scope of *Toussaint* is not limited to discharge-for-cause contracts. While *Toussaint* focused on the question whether the specific discharge-for-cause statement contained in the employer's policy manual and oral statements to that effect gave rise to a binding contract, the Court's holding was phrased in broad terms; the Court said that "employer statements of policy, such as the Blue Cross Supervisory Manual and Guidelines, can give rise to contractual rights in employees . . . ." *Id.,* pp 614-615. The Court also said that "[r]ecognition that contractual obligations can be implicit in employer policies and practices is not confined to cases where compensation is in issue," *id.,* p 617, thereby indicating that express policies other than those pertaining to job security can, in a proper context, become binding.

Any policy statement, then, may give rise to a contractual obligation under *Toussaint.* A policy statement in a manual or in a casual conversation with a superior does not, however, automatically rise to the level of a contract. Only those statements that create legitimate expectations in a reasonable employee are actionable. See n 31.

Before a court can address the question of an
employee's legitimate expectations arising from
such statements of policy, the trier of fact must
determine which employer statements, oral and
written, were a part of the contract of employ-
ment. Because this involves a factual inquiry in
the instant case, the circuit judge properly denied
summary judgment.

We are bound to accept all well-pleaded facts as
true when reviewing the ruling on AAA's motion
for summary judgment. The oral employment con-
tract, as described by Bullock, supports a claim for
breach of contract. Bullock alleged that his oral
contract of employment provided that AAA would
terminate him only if he were caught stealing and
that he would be compensated on a seven percent
commission plan based on his "book of business."
Bullock's pleadings presented questions of fact
whether AAA breached the alleged contractual pro-
visions. Bullock has sufficiently stated a claim on
which relief could be granted.

Nor did the oral statements made to Bullock at
the time of hiring necessarily lack the definiteness
required to form a binding contract as a matter of
law. Oral statements may be as binding as written
statements.

AAA filed an affidavit in support of its motion for
summary judgment, asserting that it had continu-
ously reviewed and revised its employment poli-
cies. The affidavit stated that the sales rules man-
ual was revised in July, 1972, November, 1973,
and July, 1975, and that memoranda issued by
AAA in 1971 and 1978 required 1971 sales person-
nel to sell a minimum of thirty memberships per
month, and 1978 sales personnel to sell a mini-
mum of twenty memberships.

Bullock relies on an oral contract of employment
allegedly entered into when he was hired in May,

1968, two or three years before the earliest memoranda adverted to in AAA's affidavit. He asserts that AAA cannot avoid its contractual obligations resulting from the claimed oral employment contract by later promulgating inconsistent general policies that apply to all employees. He notes that the record is sparse because virtually no discovery has been conducted, and that AAA has not filed an answer and thus has not denied the oral promises asserted by Bullock. He states that the general provisions of the sales rules manual pertaining to production standards and continued employment contradict the express oral agreements regarding compensation and job security that were negotiated terms of the oral employment agreement and that the arguments advanced by AAA and amicus curiae obscure the real issue: "Did the Auto Club agree to employ Bullock as a commission salesperson at a rate of seven percent commission on all new sales and renewals and to restrict its right to discharge Bullock for reasons other than dishonesty or theft?"

Preliminary and central questions are whether the terms alleged by Bullock in his complaint were the terms of the contract of employment, and whether and to what extent provisions of the sales rules manual, consistent or inconsistent with the terms alleged, were part of the contract of employment. It is a separate question whether provisions of the sales rules manual that were in fact part of the contract could, consistent with legitimate expectations generated by AAA's policy statements set forth in the sales rules manual, be revised in the manner AAA claims it had the right to revise them.

B

AAA asserts that, under *Toussaint,* it was enti-

tled to make unilateral changes in policy, including the change in the compensation structure and the implementation of production standards. It therefore follows, according to AAA, that these changes could be made and enforced regardless of rights and duties previously established.

AAA further reasons that just as employers have a common-law right to terminate an employee at will who is hired for an indefinite term, they may similarly rescind at will a personnel policy implemented for an unspecified period where the employer has not demonstrated an intention of maintaining such a policy permanently. AAA suggests that while an employee can reasonably expect that an employer will apply its current policies uniformly, an employee cannot, given the routine changes that businesses must periodically make, expect that policies will continue to be in force indefinitely.

While *Toussaint* did state that the employer could make unilateral policy changes,[28] that statement should be read in light of *Toussaint's* primary holding that an employee may enforce legitimate expectations that have been generated by an employer's statements of policy.[29]

---

[28] *Toussaint, supra,* pp 613-615.

[29] An employer who establishes no personnel policies instills no reasonable expectations of performance. Employers can make known to their employees that personnel policies are subject to unilateral changes by the employer. Employees would then have no legitimate expectation that any particular policy will continue to remain in force. Employees could, however, legitimately expect that policies in force at any given time will be uniformly applied to all. If there is in effect a policy to dismiss for cause only, the employer may not depart from that policy at whim simply because he was under no obligation to institute the policy in the first place. Having announced the policy, presumably with a view to obtaining the benefit of improved employee attitudes and behavior and improved quality of the work force, the employer may not treat its promise as illusory. [*Toussaint, supra,* p 619.]

It is not possible to answer AAA's question—whether it could unilaterally revise its policies set forth in the sales rules manual, including required standards of job performance—in the abstract. That question can only be answered after the trier of fact has defined the terms of Bullock's contract of employment, including the extent, if at all, the provisions of the sales rules manual are terms of the contract and, if they are, the court[30] has determined what legitimate expectations would be generated in a reasonable employee as a result of those contractual terms.

There will be situations where the employer's unilateral changes in policy are consistent with its employees' legitimate expectations without regard to whether the employer has given explicit notice that its policies are subject to change or has established a pattern of revising its policies periodically. Notice is not the critical issue, although it may be a relevant factor.

The proper focus is the legitimate expectations of the reasonable employee. Certain policies may not involve subject matter of sufficient significance to engender legitimate expectations worthy of enforcement. Similarly, changes, even when made with respect to critical terms of employment, may be so minor that there is little or negligible interference with employee legitimate expectations.

In determining what a reasonable employee in Bullock's position might legitimately expect, the court might consider, among other things, such factors as the nature of the change, whether changes in that regard have previously been made and implemented, length of employment and job status before and after the policy change.[31] Be-

---

[30] See n 34.

[31] Neither *Valentine v General American Credit, Inc,* 420 Mich 256;

cause Bullock claims that the production stan-
dards and adoption of the "unit compensation"
plan had a more severe effect on senior commis-
sion sales representatives with commitments to
large "books of business," the extent of the com-
mitment involved in servicing Bullock's "book of
business" should also be examined.

In joining in the affirmance of the Court of
Appeals conclusion that summary judgment was
properly denied, I do not wish to be understood as
stating that an employer may only make unilat-
eral changes where the employees have been given
specific notice that the employer has reserved the
right to do so. An employer retains the right to
unilaterally modify its policies where the change
will not defeat the legitimate expectations of its
employees.

IV

AAA maintains that unilateral contract princi-
ples bind Bullock to AAA's revisions regardless of
the original terms of the employment contract.
Under this analysis, when an employer unilater-
ally changes its policies, an employee's continued
performance constitutes consideration for, and ac-
ceptance of, the new terms of employment. An
employee is then bound by the new terms and can
no longer rely on the employer's prior policies.

In *In re Certified Question,* this Court considered
unilateral contract analysis in a case concerning
an employer's unilateral change from a discharge-
for-cause policy to a termination-at-will policy, and

362 NW2d 628 (1984), nor any other decision of this Court supports
the statement in the dissenting opinion that the rationale of *Tous-
saint* "has been confined by this Court to claims of wrongful dis-
charge." *Post,* p 521. See n 27.

said that it found "unilateral contract theory . . .
inadequate as a basis for [its] answer. . . ."[32]

Even if the revision in the manual in *In re
Certified Question* from discharge for cause to
termination at will was an offer by Storer Broad-
casting Company of a change in the employment
contract, there was no reason to suppose that the
plaintiff, Kenneth Bankey, accepted such an offer.
See *Thompson v Kings Entertainment,* 653 F Supp
871 (ED Va, 1987), where the court said that the
employer failed to show that the employee had
accepted the revision in policy from dismissal for
cause to termination at will. In *Pine River State
Bank v Mettille,* 333 NW2d 622 (Minn, 1983), and
*Duldulao v St Mary of Nazareth Hosp Ctr,* 115 Ill
2d 482; 505 NE2d 314 (1987), the employers dis-
tributed manuals that conferred greater rights on
the employees. In such a case, it is ordinarily
reasonable to find that the employee accepted the
beneficial terms.

V

AAA is concerned that the Court of Appeals
decision in *Bullock* provides an employee access to
a jury if he merely claims that he interpreted his
employer's oral statements or practices as estab-
lishing policies inducing his reliance. Amicus cu-
riae also expresses concern that submitting such
issues to a jury will inevitably strip employers of
the right to change their policies. Both AAA and
amicus curiae maintain that juries are inherently
biased toward employees and thus are incapable of
rendering a just verdict in this context. They fear
that employment discharge cases ask juries of
laymen to second-guess the complicated decision-

---

[32] *In re Certified Question,* p 453.

making processes of corporate and small business
employers.

The preliminary and central question of what
the terms of the employment contract in fact are
is clearly a question for the trier of fact, a jury
where one has been requested. Contract interpre-
tation may present a question of law.[33] Once the
trier of fact has determined what are the terms of
the employment contract, the separate question of
what legitimate employee expectations were gener-
ated by employer policy statements found to be a
part of the contract is a question of law[34] for the
Court.[35]

VI

The dissenting opinion would dismiss the com-
plaint for failure to state a claim on a ground not

[33] See Farnsworth, Contracts, § 7.14, pp 515-517.

[34] In the following areas of law, judges consider facts to resolve
questions of law: public figure status in libel actions, *Rosenblatt v
Baer,* 383 US 75; 86 S Ct 669; 15 L Ed 2d 597 (1966); former jeopardy,
*Mitchell v Forsyth,* 472 US 511, 528; 105 S Ct 2806; 86 L Ed 2d 411
(1985); immunity for members of Congress, *id.,* probable cause in an
action for malicious prosecution, *Koski v Vohs,* 426 Mich 424; 395
NW2d 226 (1986); promissory estoppel, *C & K Engineering Contrac-
tors v Amber Steel Co, Inc,* 23 Cal 3d 1, 7-8; 151 Cal Rptr 323; 587
P2d 1136 (1978).

It may be the court's duty to determine what conduct is "reason-
able" in a given context. The Fourth Amendment protects against
unreasonable searches and seizures. Although there is a large factual
quotient in the resolution of what constitutes an "unreasonable"
search and seizure, this voluminous body of law—LaFave, Search &
Seizure (2d ed), which now comprises four volumes—has been devel-
oped by judges sitting without a jury who have, in the application of
tests enunciated by the United States Supreme Court and other
courts, elucidated at great length on what is "reasonable" and "un-
reasonable."

[35] Depending on the nature of the factual dispute requiring jury
resolution, the court might either instruct the jury regarding the
legitimate expectations that would arise if it finds for the employee
on the disputed factual issues or, if that does not appear feasible or
desirable, await before ruling thereon the jury's response in the form
of a special verdict that includes questions concerning damages.

urged in the trial court.[36] While AAA's motion for summary judgment asserted that Bullock had failed to state a claim on which relief can be granted, the bases of that assertion were grounds other than those adopted in the dissenting opinion.

The dissenting opinion, recognizing that oral assurances were held in *Toussaint* to be sufficient to require submitting the question whether there was a contract to a jury,[37] states that "not all oral assurances merit jury consideration."[38] It is suggested that the expressions relied on by Bullock were not " 'clear and unequivocal.' "[39] It is said that Bullock could not have reasonably relied on the oral assurances he alleged as a means of creating a contract of employment which was not

[36] See n 7.

[37] *Post*, p 514; *Toussaint*, p 597.

[38] *Post*, p 515.

[39] *Post*, p 517.

The dissenting opinion states:

> Furthermore, the rule of construction set forth in *Lynas,* which is preserved by *Toussaint*,[3] provides that a lifetime employment contract, even if agreed to, is generally construed as an indefinite hiring, terminable at the will of either party, in the absence of distinguishing features or special consideration in addition to the services to be rendered.

> [3]*Toussaint, supra,* at 596-597, 632. [*Post,* pp 517–518.]

*Toussaint* states, however:

> [A] provision of an employment contract providing that an employee shall not be discharged *except for cause* is legally enforceable *although the contract is not for a definite term—* the term is "indefinite . . . ." [*Id.,* p 598. Emphasis added.]

> No authority is cited by Blue Cross, Masco or our colleague for the proposition that where an employer has agreed that an employee hired for *an indefinite term shall not be discharged except for cause* the employer may, nevertheless, terminate the employment without cause. [*Id.,* p 609. Emphasis added.]

terminable at will unless there were distinguishing features or provisions or special consideration.[40]

Putting aside that there is a suggestion in one of the briefs that Bullock may have left the employ of another employer to accept employment with AAA, which, if true, might constitute a distinguishing feature or provision or special consideration, there is no rule of law requiring that a contract that need not be in writing be more specific or clear and less equivocal when it is oral than when it is in writing. Also putting aside that the disposition proposed in the dissenting opinion has not been explored at the trial level, AAA has not answered or denied the allegations that such a contract was entered into, there is no rule making unenforceable as a matter of law the contract alleged by Bullock.

While the dissenters may find it incredible that an employer would undertake to employ a person on the terms alleged by Bullock, issues of credibility are to be resolved by the trier of fact. In this connection, it is significant that a number of other former AAA employees have made similar allegations.[41]

The law implies terms of written and oral contracts. Bullock was not discharged because he was "inefficient, absent, tardy, slovenly, reckless, nonproductive" or "violent."[42] If AAA had sought to discharge him for one of those undesirable traits or for criminal activity other than thievery, the

---

[40] *Post*, p 517.

[41] See *Dumas v Auto Club Ins Ass'n*, 168 Mich App 619; 425 NW2d 480 (1988) (180 plaintiffs); *Farrell v Auto Club of Michigan*, 155 Mich App 378; 399 NW2d 531 (1986).

[42] *Post*, p 516. While Bullock was discharged for failing to meet AAA's production standards, that does not necessarily mean he was "nonproductive." It is Bullock's claim that he had been productive in creating a "book of business" and had a contractual right to continue to work on his "book of business."

question would then arise whether it might do so by reason of breach of an implied term of the contract of employment. A contract is not defective because the parties have not provided for contingencies that another person or a lawyer might have sought to address.

## VII

In conclusion, the determinations of the circuit court and Court of Appeals that Bullock's state law claims are not preëmpted by federal labor law are affirmed. Also affirmed is the denial of AAA's motion for summary judgment. Bullock has sufficiently stated a claim on which relief can be granted. AAA has failed to demonstrate that it is entitled to judgment as a matter of law. Critical questions of fact remain undeveloped and should be developed at trial.

The cause is remanded to the circuit court.

GRIFFIN, J. (*concurring in part and dissenting in part*). I concur that plaintiff's claim is not preëmpted by the National Labor Relations Act. Since the majority concludes that remand is required, I join in the observation that to the extent that plaintiff's claim is based upon "legitimate expectations grounded in an employer's written policy statements,"[1] guidelines for resolution are provided by *In re Certified Question, Bankey v Storer Broadcasting,* 432 Mich 438; 443 NW2d 112 (1989), also decided today. However, I disagree with the majority's conclusion that summary disposition would be premature on the basis of this record.

Plaintiff's claim of a termination-for-cause agree-

---

[1] *Toussaint v Blue Cross & Blue Shield of Michigan,* 408 Mich 579, 598; 292 NW2d 880 (1980).

ment hangs on his assertion that at the time of hire he was orally promised "a lifetime job as long as he did not steal."

I conclude that it simply is not reasonable to construe such an assertion as an enforceable agreement to discharge only for cause. Subjective expectancies of continued employment do not constitute a termination-for-cause contract under *Toussaint,* and plaintiff's claim should fail as a matter of law.

I

It is still the general rule that employment for an indefinite term is presumed to be terminable at the will of either party.

> Contracts for permanent employment or for life have been construed by the courts on many occasions. In general it may be said that in the absence of distinguishing features or provisions or a consideration in addition to the services to be rendered, such contracts are indefinite hirings, terminable at the will of either party. [*Lynas v Maxwell Farms,* 279 Mich 684, 687; 273 NW 315 (1937).]

See also anno: *Right to discharge allegedly "at-will" employee as affected by employer's promulgation of employment policies as to discharge,* 33 ALR4th 120. The underlying rationale for this rule is that "[b]ecause the parties began with complete freedom, the court will *presume* that they intended to obligate themselves to a relationship at will." *Toussaint v Blue Cross & Blue Shield of Michigan,* 408 Mich 579, 600; 292 NW2d 880 (1980).[2]  (Emphasis added.)

---

[2] Contracts at will are not the exception, but the rule, perhaps for the following reason:

In Michigan, however, this general rule has been in danger of being swallowed up by the "narrow exception" carved out and announced by this Court in *Toussaint*. In that case the Court held:

> (1) a provision of an employment contract providing that an employee shall not be discharged except for cause is legally enforceable although the contract is not for a definite term—the term is "indefinite," and
>
> (2) such a provision may become part of the contract either by express agreement, oral or written, or as a result of an employee's legitimate expectations grounded in an employer's policy statements. [*Id.* at 598.]

The *Toussaint* decision neither vitiated the employment-at-will presumption nor did it create new or special rights. As explained in *Valentine v General American Credit, Inc,* 420 Mich 256, 258-259; 362 NW2d 628 (1984),

> *Toussaint* makes employment contracts which provide that an employee will not be dismissed except for cause enforceable in the same manner as other contracts. It did not recognize employment as a fundamental right or create a new

The contract at will is also a sensible private adaptation to the problem of imperfect information over time. In sharp contrast to the purchase of standard goods, an inspection of the job before acceptance is far less likely to guarantee its quality thereafter. The future is not clearly known. More important, employees, like employers, *know what they do not know.* They are not faced with a bolt from the blue, with an "unknown unknown." Rather they face a known unknown for which they can plan. The at-will contract is an essential part of that planning because it allows both sides to take a wait-and-see attitude to their relationship so that new and more accurate choices can be made on the strength of improved information. [Epstein, *In defense of the contract at will,* 51 U Chi L R 947, 969 (1984).]

"special" right. The *only* right held in *Toussaint* to
be enforceable was the right that arose out of the
promise not to terminate except for cause.

Employers and employees remain free to pro-
vide, or not to provide, for job security. Absent a
contractual provision for job security, either the
employer or the employee may ordinarily termi-
nate an employment contract at any time for any,
or no, reason. The obligation that gave rise to this
action is based on the agreement of the parties; it
is not an obligation imposed on the employer by
law. [Emphasis added.]

At one point the *Toussaint* Court emphasized
the limits of its ruling:

We hold *only* that an employer's express agree-
ment to terminate only for cause, or statements of
company policy and procedure to that effect, can
give rise to rights enforceable in contract. [*Tous-
saint, supra,* at 610. Emphasis supplied.]

However, it cannot be denied that *Toussaint*
pushed heavily against and through the bounda-
ries of employment contract law with such lan-
guage as:

It is enough that the employer chooses, presum-
ably in its own interest, to create an environment
in which the employee believes that, whatever the
personnel policies and practices, they are estab-
lished and official at any given time, purport to be
fair, and are applied consistently and uniformly to
each employee. The employer has then created a
situation "instinct with an obligation."

\*   \*   \*

We hold that employer statements of policy . . .
can give rise to contractual rights in employees
without evidence that the parties mutually agreed
that the policy statements would create contrac-
tual rights in the employee, and, hence, although

the statement of policy is signed by neither party, can be unilaterally amended by the employer without notice to the employee, and contains no reference to a specific employee, his job description or compensation, and although no reference was made to the policy statement in preemployment interviews and the employee does not learn of its existence until after his hiring. [*Id.*, pp 613, 614-615.]

When mutual assent is replaced by the "expectations" of one party as the measure of contract viability, an invitation to litigate is heralded, loud and clear. We need look only at the stampede to the courts which has followed in the wake of *Toussaint* to realize, nine years later, that some lines of reasonable limitation must be drawn. A reasonable limit was recognized today in *In re Certified Question* with the holding that a termination-for-cause policy set forth in a manual may be changed, even though the employer had not expressly reserved the right to do so.

The case at hand presents a further important opportunity to provide reasonable definition for what has come to be known as the *Toussaint* doctrine. Plaintiff claims to have an employment contract for the rest of his life, on the basis of an oral statement allegedly made at hiring that he would "have a lifetime job as long as he did not steal." Plaintiff contends that a jury should now be allowed to decide whether such a purported assurance gave rise to an enforceable contract terminable only for the single cause of thievery.

To be sure, in some situations lower courts and federal courts have held that rather general statements may go to the jury as the basis of a termination-for-cause contract. See, e.g., *Cowdrey v A T Transport*, 141 Mich App 617; 367 NW2d 433 (1985) (the employee testified that he was promised

that he "would never have to worry" as long as he did his job), *Hetes v Schefman & Miller Law Office,* 152 Mich App 117, 119; 393 NW2d 577 (1986) (the employee would "[have] a job as long as [she] did a good job"), *Walker v Consumers Power Co,* 824 F2d 499, 503 (CA 6, 1987) (the employer promised that the employee would not be fired as long as he "performed adequately" and "did a good performance on [his] job"), and *Ritchie v Michigan Consolidated Gas Co,* 163 Mich App 358; 413 NW2d 796 (1987).

However, other courts have held, sensibly, that not all oral assurances merit jury consideration. In *Broussard v Caci, Inc,* 780 F2d 162, 163 (CA 1, 1986), the court distinguished between "puffery and promise":

> Employment negotiations resulting in employment are by definition conducted in an atmosphere of optimism and mutual hope. The air is redolent with expectation of duration on the part of the employee and of satisfactory performance by the employer. But to equate general expressions of hope for a long relationship with an express promise to discharge only for good cause would effectively eliminate [the rule] . . . that contracts for indefinite employment are, without more, terminable at will.

Yet another court has made this distinction:

> Since *Toussaint,* the Court has been faced with a number of cases where the plaintiff has claimed a *Toussaint* contractual obligation arising out of the employer's hiring agent telling plaintiff at the time of employment that plaintiff could be employed "as long as he did the job" or similar expressions such as "as long as there is work to do," "as long as your work is satisfactory," "as long as you want," etc. When you examine these

statements, each, standing alone, simply does not constitute a contract or agreement with any specific duration. Each was clearly within the policy of the *Lynas* case where an employment agreement for an indefinite term such as each of these was held to be an employment at will. After all *Lynas* as well as reality compels recognition of the fact that neither party to the beginning of an employment relationship expects it to be unsatisfactory, and both hope it will have a significant duration. This hope and noncontractual wish is expressed in terms of language such as "as long as you do the job." Hence, the *Toussaint* exception to *Lynas* must mean more than merely this language. While it is true that as the economy and society change, we can expect employment durational rules will be altered. That was probably the basis for the specific recognition in *Toussaint* that the employer will be held accountable for allowing a hiree to *reasonably* believe that there was a *specific* durational term to the employment; but it must be based on more than the expression of an optimistic hope of a long relationship. [*Carpenter v American Excelsior Co,* 650 F Supp 933, 936, n 6 (ED Mich, 1987).]

Such an admonition is warranted. Caution should be exercised in judging the viability of a breach of contract action based solely on an alleged oral representation recalled with remarkable specificity long years after the time of hiring.

The present case presents an intriguing example. Plaintiff claims a "lifetime job . . . as long as he did not steal." If we take the employer at his word, this precatory phrase sets forth an inherently indefinite term of employment (a lifetime); yet it simultaneously provides for discharge only for a single cause (thievery). As plaintiff would have it, he could be inefficient, absent, tardy, slovenly, reckless, nonproductive and even violent —to mention only a few undesirable traits; how-

ever, he could not be terminated unless he committed the one cognizable cause for ending the relationship—stealing.

Surely, a modicum of realism and common sense is needed. An assurance such as that alleged in the instant case simply cannot be separated from the realities of the working world. It should be recognized that "lifetime" employment contracts are extraordinary and, being so, "must be expressed in clear and unequivocal terms before a court will conclude that an employer intended to enter into such a weighty obligation." *Chastain v Kelly-Springfield Tire Co,* 733 F2d 1479, 1484 (CA 11, 1984). See also *Naz Agency, Inc v US Fidelity & Guaranty Co,* 277 F2d 640, 641 (CA 6, 1960). Otherwise stated, "A casual remark made at a meeting, a phrase plucked out of context, is too fragile a base on which to rest such a heavy obligation inherent in such a contract." *Brown v Safeway Stores, Inc,* 190 F Supp 295, 299-300 (ED NY, 1960).

Whether or not Bullock carried a subjective expectancy that he would work for this employer for the rest of his life, it is difficult to believe that any reasonable person would rely on such an oral assurance as the basis of an interminable employment contract "as long as he did not steal." I would hold that the allegations put forth in the instant case are insufficient as a matter of law to provide the basis for an employment contract that is not terminable at will.

Furthermore, the rule of construction set forth in *Lynas,* which is preserved by *Toussaint,*[3] provides that a lifetime employment contract, even if agreed to, is generally construed as an indefinite hiring, terminable at the will of either party, in

---

[3] *Toussaint, supra* at 596-597, 632.

the absence of distinguishing features or special consideration in addition to the services to be rendered. I am compelled to disagree with a suggestion in the majority opinion that special consideration sufficient to satisfy *Lynas* might exist in the instant case. *Ante*, p 482, n 9. As I read the pleadings, plaintiff does not aver that any particular benefit inured to the defendant, or that any particular hardship was incurred by plaintiff, distinguishable from that expected from the normal performance of all commissioned salespersons.

Accordingly, in conformity with *Lynas*, the motion for summary disposition should have been granted.

II

Although the majority opinion appropriately focuses only upon plaintiff's claim of wrongful discharge, *ante*, p 477, n 5, plaintiff's complaint includes claims that reach into other areas of the employment relationship. For example, he contends that he was orally assured at hiring that he "would work as a commission salesman for Defendant and enjoy the benefits of a seven (7%) percent commission for sales . . . ," and that "if he worked hard and built up his 'book of business,' he would be able to earn large sums of money . . . and could enjoy his later working years . . . ."

I address these ancillary claims for the purpose of explaining why they also fail as a matter of law, and to emphasize that the *Toussaint* rationale has been confined by this Court to claims of wrongful discharge.

Plaintiff began his employment with defendant in 1968. Ten years later, in 1978, defendant changed the method by which it compensated sales personnel, replacing the straight seven percent

commission with a "unit compensation plan,"
whereby sales representatives were paid commis-
sions calculated as a specified dollar amount,
rather than as a percentage of the insurance
premiums. This change in the method of compen-
sation applied across the board to all of AAA's
commission sales representatives,- and not just to
plaintiff. Plaintiff continued to work for nearly
four years thereafter, and was compensated under
the new plan until he was terminated as a sales
representative in 1982.

Plaintiff now complains that by modifying its
method of compensation in 1978, and by institut-
ing production standards in 1981, defendant
breached an oral contract purportedly entered into
when he was hired. Specifically, plaintiff alleges
that defendant "breached said promises and
changed its policies without advising Plaintiff
when Plaintiff came into the employ of Defendant
that Defendant was reserving the right to do so
. . . ."

Of course, a promise to pay commissions on sales
actually made is enforceable, even when the un-
derlying agreement is for an indefinite duration.
*Reed v Kurdziel,* 352 Mich 287, 295; 89 NW2d 479
(1958). Depending on the terms agreed upon, com-
missions on sales originally procured could con-
tinue to accrue even after an employee is termi-
nated. Accordingly, plaintiff might have a valid
claim concerning defendant's obligation to pay
commissions accruing from the book of business
established by the plaintiff *prior to defendant's
change in the method of compensating its sales
staff.* However, the assertions in plaintiff's com-
plaint do not support a claim that defendant abro-
gated its managerial prerogatives to modify the
method of compensating its sales personnel.

An employer's intention to give up permanently

a right so fundamental as the ability to make changes in its method of compensation is not to be lightly inferred. In his complaint, plaintiff reveals that the assurances on which he relies were expressed in terms of a company policy "which had been in effect for many years." There was no express statement that the policy would continue for a fixed period of time or that the policy could not be changed in the future.

Furthermore, there is no basis for an inference that the compensation method in effect at hire would forever remain unchanged. On the contrary, the fact that policies set out in distributed manuals were later modified rebuts such an inference.

Since I would conclude under part I that plaintiff was an employee at will, it logically follows that the right of an employer to terminate the relationship "necessarily includes the right to insist upon changes in the compensation arrangements as a condition of continued employment." *Green v Edward J Bettinger Co,* 608 F Supp 35, 42 (ED Pa, 1984), aff'd 791 F2d 917 (1986), cert den 479 US 1069 (1987). Thus, an employee in a termination-at-will relationship, once informed of a change in compensation rates, can either accept the new rates or exercise his own right to terminate the relationship. *Hathaway v General Mills, Inc,* 711 SW2d 227 (Tex, 1986); *Facelli v Southeast Marketing Co,* 327 SE2d 338 (SC, 1985). If an employee continues to work with knowledge of the changes, he impliedly accepts the modification. *Hathaway, supra; Albrant v Sterling Furniture Co,* 85 Or App 272; 736 P2d 201 (1987).

Surely, where an employee continues to work under a revised compensation system for nearly

four years, as in the case at bar, acceptance by the employee should be implied as a matter of law.[4]

Furthermore, *In re Certified Question, supra,* decided today, supports the proposition that an employer may unilaterally make such a policy change although the right to do so has not been expressly reserved. If even a just-cause termination policy can be modified or revoked, surely policies of lesser import may also be changed.

It is noteworthy that during a period of more than nine years since *Toussaint,* its rationale has been confined by this Court to claims of wrongful discharge. The point was reiterated in *Valentine, supra,* p 258, where this Court stated: "[t]he only right held in *Toussaint* to be enforceable was the right that arose out of the promise not to terminate except for cause."

Our lower courts, whose experience with *Toussaint*-based claims is extensive, have shown understandable reluctance to extend *Toussaint* beyond wrongful discharge disputes. For example, see *Dyer v Dep't of State Police,* 119 Mich App 121; 326 NW2d 447 (1982) (rejecting the plaintiffs' claim that department policy and practice had given rise to a contractual right to nonduty use of state vehicles, on the basis that rights and duties of the parties relative to vehicle use were not regulated by implications), and *Engquist v Livingston Co,* 139 Mich App 280; 361 NW2d 794 (1984) (rejecting the plaintiff's claim that a fourteen-year history of step increases had given rise to a *Toussaint*-based entitlement to step increases).

Even if it can be said that policy considerations were sufficient to justify the *Toussaint* intervention to protect job security, it is difficult to imagine the scope of difficulties and mischief that would be

---

[4] Plaintiff does not contend that he was not fully compensated for services rendered.

encountered if *Toussaint* were to be extended beyond wrongful discharge into every facet of the employment relationship. Particularly in light of the enormous potential cost to the system that such an extension would entail, including damage to the delicate balance of the employee-employer relationship, I take this occasion to express the view that it would be prudent and wise to leave to the Legislature the public policy decision whether, or to what extent, *Toussaint* should be extended beyond wrongful discharge.

### III

Defendant has argued in this Court that plaintiff's claim of lifetime employment based on an oral promise should be barred as in violation of the Michigan statute of frauds.[5] Because Bullock's assertion of a "lifetime contract" is exactly the sort of promise that courts should generally decline to enforce unless it is in writing, I feel compelled to make the following observations.

It is one of the curiosities of the common law that contracts for permanent or lifetime employment have been held to fall outside the scope of the statute of frauds. On its face the statute appears to require that promises contemplating long-term commitments, such as that alleged in the instant case, be validated by written evidence in order to be enforceable:

> In the following cases an agreement, contract or promise shall be void, unless that agreement, contract, or promise, or a note or memorandum thereof is in writing and signed by the party to be charged therewith, or by a person authorized by him:

---

[5] MCL 566.132; MSA 26.922. The majority declines to address this issue since it was not raised at the trial level. *Ante,* p 481, n 8.

(a) *An agreement that, by its terms, is not to be* *performed within 1 year from the making thereof.* [MCL 566.132(a); MSA 26.922(a). Emphasis supplied.]

Since enactment of the original English statute in 1676,[6] however, courts have chafed under its restrictions.[7] The undisputed trend of authority has been to interpret the "one year" provision as applying only to contracts that have no possibility of being completed within a year, even if the parties to the contract in fact contemplated a longer period.[8] Michigan's case law has followed that trend by applying the nonstatutory "capable of performance" exception to the one-year provision of the statute of frauds.[9]

Significantly, the primary reason used to explain the result in the case of an oral contract for permanent or lifetime employment is that such contracts are terminable at will. See, for example, *Sax v Detroit, G H & M R Co,* 125 Mich 252, 255-256; 84 NW 314 (1900). This rationale was typified in *Adolph v Cookware Co of America,* 283 Mich 561, 568; 278 NW 687 (1938):

> Plaintiff's proofs, taken as true, showed a contract for permanent employment. Such a contract is for an indefinite period and, unless for a consid-

---

[6] 29 Car II, c 3. Comparisons between present time and the late seventeenth century should be made cautiously, if at all. Nevertheless, one scholar's observation about the conditions which gave rise to the statute is so strikingly familiar that it demands reflection: "Litigation indeed came close to a form of sanctioned aggression, and it was an aggressive age." Simpson, A History of the Common Law of Contract, p 599.

[7] Farnsworth, Contracts, § 6.1, p 373.

[8] Corbin, Contracts, § 446, pp 553-554.

[9] The earliest Michigan case to apply the "capable of performance" exception appears to be *Smalley v Mitchell,* 110 Mich 650, 652; 68 NW 978 (1896). See also *Toussaint, supra,* p 612, n 24, and the cases cited therein.

eration other than promise of services, the employment was terminable at the will of either party. *Lynas v Maxwell Farms,* 279 Mich 684, and cases there cited.

Prior to *Toussaint,* the implications of such an interpretation were not ominous. Although an employment contract for an indefinite period fell outside the statute of frauds, the well-established termination-at-will doctrine had the counter-balancing effect of providing protection from fraudulent allegations of oral promises.

It is not surprising that, faced with the problems of proof presented since *Toussaint* by erosion of the employment-at-will doctrine, some courts have begun to question the wisdom of exempting employment contracts from the requirement that they be in writing where it is clear that performance beyond a year is contemplated. See, for example, *Molder v Southwestern Bell Telephone Co,* 665 SW2d 175 (Tex App, 1983); *Evans v Floor Distribution Co,* 799 F2d 364 (CA 7, 1986); *Hodge v Evans Financial,* 262 US App DC 151, 163; 823 F2d 559 (1987) (MacKinnon, J., dissenting).

In Michigan, a trial court recently found that several wrongful discharge claims brought against the instant defendant, alleging promises virtually the same as Bullock's, were barred by the statute of frauds. However, the Court of Appeals reversed, relying on the "capable of performance" exception as expressed in *Adolph, supra,* p 568. *Dumas v Auto Club Ins Ass'n,* 168 Mich App 619, 631; 425 NW2d 480 (1988).

In California, an appellate court has recognized that the statute of frauds issue can no longer be routinely avoided given recent developments in employment law:

> The traditional view is that such a contract could conceivably be performed within one year by termination of the employment agreement by one

party or the other. Since such an employment agreement has long been interpreted as being for an indefinite period, it is terminable at will by either party. . . .

Appellant alleges that respondent did not have the option of terminating him at will without good cause. . . .

*Appellant cannot have it both ways. Either his employment relationship was a contract in which both parties had equal rights to terminate at will (in which case it was not in violation of the statute of frauds), or it was a contract where the employer did not have the right to terminate at will, and there was a reasonable expectation of employment for more than one year (in which case the statute of frauds does apply, barring this action).* [*Newfield v Ins Co of the West,* 156 Cal App 3d 440, 446; 203 Cal Rptr 9 (1984). Emphasis supplied.][10]

The statute of frauds "reflects a judgment that parol evidence of certain types of agreements is so inherently suspect that it should not even be presented to a jury, an institution otherwise generally considered capable of distinguishing fact from invention." *Thompson v Stuckey,* 300 SE2d 295, 298 (W Va, 1983).

The oral promise of a lifetime job alleged in this case by Bullock certainly falls within that category. As I see it, the time has come to revisit this antiquated interpretation of the statute of frauds which makes no sense in the post-*Toussaint* era. If this Court does not do so, it is hoped the Legislature will see the wisdom of making needed adjustments of the statute.

---

[10] The California Supreme Court in *Foley v Interactive Data Corp,* 47 Cal 3d 654; 254 Cal Rptr 211; 765 P2d 373 (1988), recently rejected the reasoning of *Newfield* and instead deferred to the majority approach by applying the "capable of performance" approach to the statute of frauds.

I would reverse the decision of the Court of Appeals.

RILEY, C.J., concurred with GRIFFIN, J.