432 Mich. 438 (1989)
443 N.W.2d 112
In re CERTIFIED QUESTION
BANKEY
v.
STORER BROADCASTING COMPANY
Docket No. 78200, (Calendar No. 18).
Supreme Court of Michigan.
Argued March 5, 1987.
Decided June 6, 1989.
Sommers, Schwartz, Silver & Schwartz, P.C. (by Donald J. Gasiorek and Patrick Burkett), for the plaintiff.
Dickinson, Wright, Moon, Van Dusen & Freeman (by John Corbett O'Meara and Theodore R. Opperwall) for the defendant.
GRIFFIN, J.
Pursuant to MCR 7.305(B), the United States Court of Appeals for the Sixth Circuit has certified, and we have agreed to answer,[1] the following question:

*441 Once a provision that an employee shall not be discharged except for cause becomes legally enforceable under Toussaint v Blue Cross & Blue Shield of Michigan, 408 Mich 57[9]; [292 NW2d 880] (1980), as a result of an employee's legitimate expectations grounded in the employer's written policy statements, may the employer thereafter unilaterally change those written policy statements by adopting a generally applicable policy and alter the employment relationship of existing employees to one at the will of the employer in the absence of an express notification to the employees from the outset that the employer reserves the right to make such a change?
We answer in the affirmative. An employer may, without an express reservation of the right to do so, unilaterally change its written policy from one of discharge for cause to one of termination at will, provided that the employer gives affected employees reasonable notice of the policy change.
I
In its order certifying the question,[2] the Court of Appeals for the Sixth Circuit set forth the following facts:
Kenneth Bankey was employed as a salesman for Storer Broadcasting Company for thirteen years until he was discharged on March 23, 1981. The reason given by Storer Broadcasting was poor job performance. On July 15, 1982, Mr. Bankey filed a complaint in the Michigan Circuit Court for the County of Oakland alleging that throughout his employment with Storer, there existed a policy that Storer would not terminate its employees without just cause, and that in reliance upon that *442 policy he remained in Storer's employ for more than twelve years. On August 24, 1982, Storer Broadcasting removed the case from the Circuit Court for Oakland County to the United States District Court for the Eastern District of Michigan on the basis of diversity jurisdiction pursuant to 28 USC 1332. This case is controlled by the substantive law of the State of Michigan.
Mr. Bankey successfully argued in the district court that his employment relationship with Storer was controlled by [a] 1980 Personnel Policy Digest [issued by Storer] which expressly states that "an employee may be ... discharged for cause." In January, 1981, Storer revised its Digest to eliminate any "for cause" requirement for discharge of its employees. The January 1981 Digest states that "[e]mployment is at the will of the company." The district court found as a matter of law that the 1980 Digest created a "for cause" employment contract and that once such a contract is established under Toussaint, the employer cannot unilaterally alter the employment relationship as to existing employees to permit discharge at will. The court's ruling on this issue was made following the defendant's motion for directed verdict at the close of plaintiff's case.
A jury awarded Mr. Bankey $55,000 in damages on his claim that Storer had breached its obligation not to discharge without cause. Storer's appeal in the United States Court of Appeals for the Sixth Circuit precipitated the certified question.
II
This Court granted the request to answer the certified question in order to resolve some of the uncertainty concerning the scope of what has come to be known as the Toussaint "handbook exception"[3] *443 to the employment-at-will doctrine.[4]Toussaint modified the presumptive rule of employment at will[5] by finding that a written discharge-for-cause employment policy may become legally enforceable in contract.[6]
In Toussaint, the plaintiff-employee testified that in response to his inquiry about job security at the time of hiring, he was given oral assurance that he would be with the company "as long as I did my job," and was handed a manual of the employer's policies. The manual stated that once a probationary period had been completed, it was the company's "policy" to discharge employees "for just cause only."[7]
The Michigan Court of Appeals set aside a jury verdict for Toussaint on the ground that "a contract for permanent employment or employment for life is a contract for an indefinite period and terminable at the will of either party" and "cannot be made other than terminable at will by a provision that states that an employee will not be discharged except for cause." Toussaint v Blue Cross & Blue Shield of Michigan, 79 Mich App 429, 434-435; 262 NW2d 848 (1977).
However, upon appeal this Court reinstated the jury verdict in Toussaint, and held:

*444 1) a provision of an employment contract providing that an employee shall not be discharged except for cause is legally enforceable although the contract is not for a definite term  the term is "indefinite," and
2) such a provision may become part of the contract either by express agreement, oral or written, or as a result of an employee's legitimate expectations grounded in an employer's policy statements.
3) In Toussaint, as in Ebling,[[8]] there was sufficient evidence of an express agreement to justify submission to the jury.
4) A jury could also find for Toussaint based on legitimate expectations grounded in his employer's written policy statements set forth in the manual of personnel policies.[[9]]
Prior to terminating the employment relationship, the employer in Toussaint had not revoked or altered its written policy statements which indicated that employees would not be discharged except for cause. Thus the Toussaint Court was not required to consider the duration of the legitimacy of an employee's expectations: Do handbook provisions setting forth a personnel policy of termination for cause support only a limited expectation that the employer will adhere to that policy while it is in effect as official company policy? Or, may an employee legitimately expect that discharge for cause has become a permanent feature of his employment contract with the company?
III
This Court indicated in Toussaint, supra, pp 614-615, *445 that an employer's right to make unilateral policy changes survives Toussaint's holding that employer statements of policy can give rise to contractual rights:
We hold that employer statements of policy ... can give rise to contractual rights in employees without evidence that the parties mutually agreed that the policy statements would create contractual rights in the employee, and, hence, although the statement of policy is signed by neither party, can be unilaterally amended by the employer without notice to the employee, and contains no reference to a specific employee, his job description or compensation, and although no reference was made to the policy statement in pre-employment interviews and the employee does not learn of its existence until after his hiring. [Emphasis added.]
Subsequent dictum, however, can be read as requiring that employees be given advance notice, directly or indirectly, that the employer reserves the right to make changes in written policies:
An employer who establishes no personnel policies instills no reasonable expectations of performance. Employers can make known to their employees that personnel policies are subject to unilateral changes by the employer. Employees would then have no legitimate expectation that any particular policy will continue to remain in force. [Id., p 619.]
In a brief submitted in connection with our consideration of the certified question, Storer asserts that an employer may unilaterally change or adopt new personnel policies without having explicitly reserved the right to do so because only a *446 unilateral contract is formed when an employee is hired for an indefinite period. Storer reasons that when an employee continues to work following an employer's unilateral change in policy, the employee's continued employment signifies acceptance of, and provides the necessary consideration for, a new unilateral contract.
A unilateral contract is one in which the promisor does not receive a promise in return as consideration. 1 Restatement Contracts, §§ 12, 52, pp 10-12, 58-59.[10] In simplest terms, a typical employment contract can be described as a unilateral contract in which the employer promises to pay an employee wages in return for the employee's work. In essence, the employer's promise constitutes the terms of the employment agreement; the employee's action or forbearance in reliance upon the employer's promise constitutes sufficient consideration to make the promise legally binding. In such circumstances, there is no contractual requirement that the promisee do more than perform the act upon which the promise is predicated in order to legally obligate the promisor. Toussaint, supra, pp 630-631 (separate opinion of RYAN, J.), citing Adolph v Cookware Co of America, 283 Mich 561; 278 NW 687 (1938).
In a typical situation, where employment is for an indefinite duration, the unilateral contract framework provides no answer to the question: When will the act bargained for by the employer be fully performed? The answer to that question depends on the characterization of the "act" for *447 which the promise is exchanged. If the "act" is simply a day's work (for a day's wage), then Storer's argument makes sense: The employer's offer is renewed each day, and each day's performance by the employee constitutes a new acceptance and a new consideration. But such a characterization can be strikingly artificial. Few employers and employees begin each day contemplating whether to renew or modify the employment contract in effect at the close of work on the previous day.
In his brief, plaintiff Bankey does not clearly state whether he relies on unilateral or a bilateral contract theory. He simply argues that any unilateral attempt by Storer to change an existing discharge-for-cause policy can be no more than a proposal for modification of the contract for which mutual assent would be required. However, Bankey admonishes us that there must be a "meeting of the minds" upon all essential points to constitute a valid contract, citing, among others, Professional Corporation v Marks, 373 Mich 673; 131 NW2d 60 (1964); Fisk v Fisk, 328 Mich 570; 44 NW2d 184 (1950); Universal Leaseway Systems, Inc v Herrud & Co, 366 Mich 473; 115 NW2d 294 (1962).
The major difficulty with such an argument as applied to the question before us is that the contractual obligation which may not be modified without mutual assent, under Bankey's theory, could have arisen without mutual assent under Toussaint's own terms: "We hold that employer statements of policy ... can give rise to contractual rights in employees without evidence that the parties mutually agreed that the policy statements would create contractual rights in the employee...." Toussaint, supra, pp 614-615. Under circumstances where "contractual rights" have arisen outside the operation of normal contract *448 principles, the application of strict rules of contractual modification may not be appropriate.[11]
IV
While a majority of jurisdictions now recognize some type of "handbook exception" to the employment-at-will doctrine,[12] there is no clear consensus *449 as to either the legal theory supporting the handbook exception or the scope of the exception. Some of the cases suggest that enforceability of a handbook policy turns on an individual employee's reliance upon its provisions,[13] though the extent to which detrimental reliance or promissory estoppel is a necessary element is not always made clear. Other courts have employed the unilateral contract theory to find an offer and acceptance of handbook provisions as terms of an employment contract.[14]
The issue now before us  whether a written discharge-for-cause policy may be modified by the employer without explicit reservation at the outset of the right to do so  has been addressed by two other courts. In Chambers v Valley Nat'l Bank, 3 IER Cases 1476 (Ariz, 1988); a bank employee hired in 1971 claimed that her layoff in 1987 breached a contractual obligation created by the bank's personnel manual. In 1984, following adoption by the Arizona Supreme Court of a handbook *450 exception[15] to the employment-at-will doctrine, the bank revised its manual and disclaimed any obligation to discharge only for cause. The United States District Court for the District of Arizona held that, given the 1984 disclaimer, the plaintiff could not reasonably have relied thereafter on the handbook as creating a contract guaranteeing discharge only for cause. Chambers, supra, p 1478. The court characterized the disclaimer as an offer of modification of a unilateral contract which the plaintiff accepted by continuing to work for the bank.
In Thompson v Kings Entertainment Co, 653 F Supp 871 (ED Va, 1987), the plaintiff employee painted signs at a Virginia theme park. In 1980, three years after he was hired, the plaintiff was given a personnel manual which included a discharge-for-cause provision. Subsequently, the theme park changed ownership, and in July, 1985, a new manual providing for employment at will was distributed. In August, 1985, the plaintiff was discharged, and he thereafter filed a diversity action in federal court, contending that the 1980 manual and various representations of his employer rebutted the presumption of employment at will. His employer argued that even if the 1980 manual created a discharge-for-cause contract, distribution in 1985 of the new manual served to reinvoke plaintiff's employment-at-will status.
Even though the Virginia Supreme Court had not recognized a handbook exception, the federal district court nevertheless rejected the employer's motion for summary judgment, finding that the effect of the 1985 manual on plaintiff's status turned on whether he had accepted the change of status and received consideration for it. The court *451 held that acceptance could not be inferred merely from plaintiff's continuing to work, and remanded the case for a jury determination of the questions of acceptance and consideration. Thompson, supra, p 876.
In addition, courts in at least five other jurisdictions have commented in dicta on the effect under similar circumstances of an employer's modification of written employment policy statements. Four of these courts have employed unilateral contract theory to analyze the enforceability of handbook provisions. In the earliest of such cases, Langdon v Saga Corp, 569 P2d 524, 528 (Okla Ct App, 1976), an Oklahoma appellate court concluded that a personnel manual's provision could supplant prior contractual terms and become a new contract "which defined the employer-employee relationship during the period the policy was in effect and the employee performed." (Emphasis added.) This conclusion was adopted by the United States Court of Appeals for the Tenth Circuit, applying Oklahoma law, in Vinyard v King, 728 F2d 428, 432 (CA 10, 1984).
The Minnesota Supreme Court, in Pine River State Bank v Mettille, 333 NW2d 622, 627 (Minn, 1983), noted that contractual obligations arising from handbooks are revocable by modification.
In the case of unilateral contracts for employment, where an at-will employee retains employment with knowledge of new or changed conditions, the new or changed conditions may become a contractual obligation. In this manner, an original employment contract may be modified or replaced by a subsequent unilateral contract.
The Supreme Court of New Jersey suggested in a footnoted dictum that contractual obligations *452 arising from handbooks are revocable for legitimate business reasons.
The contract arising from the manual is of indefinite duration. It is not the extraordinary "lifetime" contract explicitly claimed in Savarese [v Pyrene Mfg Co, 9 NJ 595; 89 A2d 237 (1952)]. For example, a contract arising from a manual ordinarily may be terminated when the employee's performance is inadequate; when business circumstances require a general reduction in the employment force, the positions eliminated including that of plaintiff; when those same circumstances require the elimination of employees performing a certain function, for instance, for technological reasons, and plaintiff performed such functions; when business conditions require a general reduction in salary, a reduction that brings plaintiff's pay below that which he is willing to accept; or when any change, including the cessation of business, requires the elimination of plaintiff's position, an elimination made in good faith in pursuit of legitimate business objectives: all of these terminations, long before the expiration of "lifetime" employment, are ordinarily contemplated in a contract arising from a manual, although the list does not purport to be exhaustive. [Woolley v Hoffman-LaRoche, Inc, 99 NJ 284, 301, n 8; 491 A2d 1257, 1266 (1985).]
In addition, the Alabama Supreme Court pointed to the revocability of handbook obligations as support for its conclusion that to enforce such provisions while they are in effect would not be unduly burdensome to employers. Quoting from Perritt, Employee Dismissal Law and Practice, p 150, the court observed that "the unilateral offer made by the employer may be characterized ... as follows: `I promise I will not dismiss you without cause (or without exhausting specified procedures) unless I change this policy before you are *453 discharged.'" Hoffman-LaRoche, Inc v Campbell, 512 So 2d 725, 734-735 (Ala, 1987).
Finally, without relying on unilateral contract theory, a Missouri court provided comment concerning the legal ability of an employer to modify such a written policy statement. In Enyeart v Shelter Mutual Ins Co, 693 SW2d 120, 123 (Mo App, 1985), the Missouri Court of Appeals, Western District, after referring to the reasoning of Toussaint, supra, stated that "if an employer elects to establish policies in its relations with employees and publishes those policies in a document distributed to employees, the employer is contractually bound to observe those policies until they are modified or withdrawn." (Emphasis added.)[16]
V
Without rejecting the applicability of unilateral contract theory in other situations, we find it inadequate as a basis for our answer to the question as worded and certified by the United States Court of Appeals. We look, instead, to the analysis employed in Toussaint which focused upon the benefit that accrues to an employer when it establishes desirable personnel policies. Under Toussaint, written personnel policies are not enforceable because they have been "offered and accepted" as a unilateral contract; rather, their enforceability arises from the benefit the employer derives by establishing such policies.
While an employer need not establish personnel policies or practices, where an employer chooses to establish such policies and practices and makes *454 them known to its employees, the employment relationship is presumably enhanced. The employer secures an orderly, cooperative and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly. No pre-employment negotiations need take place and the parties' minds need not meet on the subject; nor does it matter that the employee knows nothing of the particulars of the employer's policies and practices or that the employer may change them unilaterally. It is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever the personnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee. The employer has then created a situation "instinct with an obligation." [Toussaint, supra, p 613. Emphasis added.]
Under the Toussaint analysis, an employer who chooses to establish desirable personnel policies, such as a discharge-for-cause employment policy, is not seeking to induce each individual employee to show up for work day after day, but rather is seeking to promote an environment conducive to collective productivity. The benefit to the employer of promoting such an environment, rather than the traditional contract-forming mechanisms of mutual assent or individual detrimental reliance, gives rise to a situation "instinct with an obligation." When, as in the question before us, the employer changes its discharge-for-cause policy to one of employment at will, the employer's benefit is correspondingly extinguished, as is the rationale for the court's enforcement of the discharge-for-cause policy.
Even though a discharge-for-cause policy may be modified or revoked, while such a policy remains *455 in effect, "the employer may not treat its promise as illusory" by refusing to adhere to the policy's terms. Toussaint, p 619. It has been suggested that if such a policy is revocable, it is of no value, and thus is the equivalent of an illusory promise. Of course, a permanent job commitment would be highly prized in the modern work force. However, it does not follow that anything less than a permanent job commitment is without meaning or value. Indeed, the prevalence of job security provisions in collective bargaining agreements that typically expire after only a few years attests to the fact that such commitments need not be permanent to have value.
Furthermore, it is important to recognize that even though an employment policy is revocable, the Toussaint approach to employer obligation promotes stability in employment relations in two significant ways: by holding employers accountable for personnel policies that "are established and official at any given time," and by requiring that such policies be "applied consistently and uniformly to each employee." Toussaint holds that an employee may "legitimately expect" that his employer will uniformly apply personnel policies "in force at any given time." Id.
It is one thing to expect that a discharge-for-cause policy will be uniformly applied while it is in effect; it is quite a different proposition to expect that such a personnel policy, having no fixed duration, will be immutable unless the right to revoke the policy was expressly reserved. The very definition of "policy" negates a legitimate expectation of permanence. "Policy" is defined as "a definite course or method of action selected (as by a government, institution, group, or individual) from among alternatives and in the light of given conditions to guide and usu[ally] determine present *456 and future decisions; ... a projected program consisting of desired objectives and the means to achieve them...." Webster's Third New International Dictionary, Unabridged Edition (1964). In other words, a "policy" is commonly understood to be a flexible framework for operational guidance, not a perpetually binding contractual obligation. In the modern economic climate, the operating policies of a business enterprise must be adaptable and responsive to change.
Were we to answer the certified question by holding that once an employer adopted a policy of discharge for cause, such a policy could never be changed short of successful renegotiation with each employee who worked while the policy was in effect, the uniformity stressed in Toussaint, supra, pp 613, 619, 624, would be sacrificed. If an employer had amended its handbook from time to time, as often is the case, the employer could find itself obligated in a variety of different ways to any number of different employees, depending on the modifications which had been adopted and the extent of the work force turnover. Furthermore, were we to answer the certified question as plaintiff Bankey requests, many employers would be tied to anachronistic policies in perpetuity merely because they did not have the foresight to anticipate the Court's Toussaint decision by expressly reserving at the outset the right to make policy changes.
While we hold today that an employer may make changes in a written discharge-for-cause policy applicable to its entire work force or to specific classifications without having reserved in advance the right to do so, we caution against an assumption that our answer would condone changes made in bad faith  for example, the temporary suspension of a discharge-for-cause policy to *457 facilitate the firing of a particular employee in contravention of that policy.
The principles on which Toussaint is based would be undermined if an employer could benefit from the good will generated by a discharge-for-cause policy while unfairly manipulating the way in which it is revoked. Fairness suggests that a discharge-for-cause policy announced with flourishes and fanfare at noonday should not be revoked by a pennywhistle trill at midnight. We hold that for the revocation of a discharge-for-cause policy to become legally effective, reasonable notice of the change must be uniformly given to affected employees.
We emphasize that our answer today is necessarily limited by the wording of the certified question which asks whether an employer under the circumstances set forth may unilaterally change from a discharge-for-cause to an employment-at-will policy.[17]
We answer the certified question in the affirmative. An employer may, consistent with Toussaint, unilaterally change a written discharge-for-cause policy to an employment-at-will policy even though the right to make such a change was not expressly reserved from the outset.
*458 RILEY, C.J., and BRICKLEY and CAVANAGH, JJ., concurred with GRIFFIN, J.
BOYLE and ARCHER, JJ., concurred in the result.
BOYLE, J. (concurring).
The district court found as a matter of law that an enforceable obligation of discharge for cause was created by the 1980 Personnel Policy Digest. The certified question posits that enforceable obligations arose "outside the operation of normal contract principles." Ante, pp 447-448. I agree, therefore, that contract theory is not appropriate in this situation. The certified question, which asks only whether in these circumstances a discharge-for-cause policy may be unilaterally changed to an employment-at-will policy, should be answered "yes." Since the pure legitimate expectations leg of Toussaint was founded on the Court's common-law authority to recognize the enforceability of obligations that were not contractual, I agree that the Court may now require that reasonable notice be uniformly given to affected employees.
ARCHER, J., concurred with BOYLE, J.
LEVIN, J. (separate opinion).
I am in substantial agreement with the conclusion and the views stated in the majority opinion. I write separately to express the basis of my agreement and to express concerns relating to certified questions.
I
Toussaint v Blue Cross & Blue Shield of Michigan, 408 Mich 579, 599, 613-615, 619; 292 NW2d 880 (1980), protects "legitimate expectations [of an employee] grounded in his employer's written policy statements." An employee could not legitimately *459 expect that there will be no change in policy statements.[1]
Although an employer may change the policies stated in an employee manual[2]  including a discharge-for-cause policy  the employer may do so in respect to an employee who worked under the discharge-for-cause policy only to the extent the change does not defeat the legitimate expectations of such an employee.
An employee who worked for a significant period of time under a discharge-for-cause policy before the change in policy to one of employment at will *460 and is terminated without cause after the change might be entitled to some relief or remedy in respect to legitimate expectations of job security that arose during his employment under the discharge-for-cause policy.[3]
If the court[4] determines that legitimate expectations of job security arose before the change in policy from discharge for cause to termination at will, the court should provide a remedy. The question what relief or remedy may be awarded an employee who worked under a discharge-for-cause policy in consequence of a change from discharge *461 for cause to termination at will has not been briefed or argued and hence cannot be decided.[5] The resolution of that question depends on the facts and circumstances of particular cases.
It has been suggested that the certified question sought an answer to the question whether a change in policy from just cause to termination at will could be made without consequence to the employer and therefore we should answer either yes or no and not "it depends."
Putting aside that the majority, in requiring reasonable notice of a change of policy, has not responded simply yes or no, and has apparently thereby indicated that there may be a consequence to an employer who failed to give reasonable notice of a change in policy, it is not unusual for litigants to take extreme positions or for a court to find a resolution somewhere between the extremes. If a resolution somewhere between the extremes is the correct judicial response, it is no less correct because, before studying the question and putting pen to paper, we may have been under the impression that we could respond with a simple yes or no.
II
Although Bankey's action against Storer Broadcasting has been tried to a jury verdict for Bankey, we may not, in responding to the certified question, stated as purely one of law, consider the record on appeal to the United States Court of Appeals for the Sixth Circuit. Nor will our response to the certified question decide Bankey v Storer Broadcasting Co. The United States Court of Appeals for the Sixth Circuit or the United States District Court, on remand, will decide the *462 meaning and effect to be given our response in light of the record made in the district court.
The question presented is not purely one of law. The statement in the majority opinion that "reasonable notice of [a] change must be uniformly given to affected employees"[6] introduces a factual component and evokes the legitimate expectations of employees who worked under the just-cause policy.
We have been greatly hampered in responding to the certified question by the abstract form of the question and the absence of the options an appellate court generally has both in the development of the law and the disposition of an appeal when the entire record is before the appellate court. The common-law tradition is to develop the law case by case with reference to the particular facts of the case.
III
This Court has not been asked to consider whether MCR 7.305(B), concerning certified questions from a federal court, is consistent with constitutional limitations on the authority of the Court. It appears there is a substantial question whether the Court has jurisdiction to respond to the certified question in this case. Since that question concerns the subject matter jurisdiction of the Court, we are obliged to notice and consider it, although it has not occurred to us before to question our jurisdiction to respond to a certified question and the parties have not raised or briefed the question.[7]
In 1976, this Court amended the court rules to *463 establish a procedure whereby it could respond to "a question that Michigan law may resolve" propounded by a federal court or a state appellate court.[8] The rule provides that the certifying court shall provide this Court with a certificate containing "a factual statement" and "the question to be answered." The rule does not in terms require that the response to the certified question be determinative of the controversy, and, indeed, in the instant case it will not be. It is again relevant that the United States Court of Appeals or the United States District Court, on remand, will decide the meaning and effect to be given this Court's response in light of the record made in the district court.
The constitution provides that "[t]he judicial power of the state is vested exclusively in one court of justice which shall be divided into one supreme court, one court of appeals, one trial court of general jurisdiction known as the circuit court, one probate court, and courts of limited jurisdiction" established by the Legislature.[9] (Emphasis added.) It is further provided that "the supreme court shall have general superintending control over all courts; power to issue, hear and determine prerogative and remedial writs; and appellate jurisdiction as provided by rules of the supreme court."[10] (Emphasis added.)
Clearly, in responding to a certified question, this Court would not be exercising its power of "general superintending control over all courts." The constitution does not confer any authority on this Court to exercise superintending control over federal courts.
Nor would the Court be exercising its power to *464 issue, hear and determine prerogative and remedial writs. No order, judgment or writ has ever been issued or could ever be issued on the basis of a response to a certified question.
In Holden v N L Industries, Inc, 629 P2d 428, 431 (Utah, 1981), the Supreme Court of Utah held that its "appellate jurisdiction" did not include responding to a certified question because "[a]ppellate jurisdiction is that power and jurisdiction to review and correct those proceedings of inferior courts...." The court said that this was the widely accepted meaning of the term appellate jurisdiction.[11]
*465 The Supreme Judicial Court of Maine, in sustaining the constitutionality of a statute providing a certification procedure, considered a number of decisions of this Court including two concerning the constitutionality of statutory procedures providing for declaratory judgments, and concluded that a response to a certified question would "be in the nature of a declaratory judgment" and within the "judicial power" if the response was "determinative of the cause." The Court concluded that its response would not be so determinative in the case presented:
If we are to participate and yet not render purely advisory opinions, we think it will be incumbent upon us to respond to questions only when it is apparent from the certification itself that all material facts have been either agreed upon or found by the court and that the case is in such posture in all respects that our decision as to the applicable Maine law will in truth and in fact be "determinative of the cause" as the statute conferring jurisdiction upon us requires. Such is not the case here.[[12]] [Emphasis added.]
*466 MCR 7.305(B) does not, in contrast with the Maine statute, require that the response to the certified question "be determinative of the cause."[13] The Maine court referred approvingly to this Court's decision in Daniels v People, 6 Mich 381, 388 (1859), where this Court said: "By the judicial power of courts is generally understood the power to hear and determine controversies between adverse parties, and questions in litigation" (emphasis added), and to this Court's decision in Underwood v McDuffee, 15 Mich 361, 368 (1867), where this Court said: "It is the inherent authority not only to decide, but to make binding orders or judgments, which constitutes judicial power" (emphasis added), and to Anway v Grand Rapids R Co, 211 Mich 592, 603, 622; 179 NW 350 (1920), where, in holding unconstitutional an act of the Legislature providing for a declaration of rights, the Court, in a lengthy opinion, observed that the power "to enter a final judgment and enforce such judgment by process, [is] an essential element of the judicial power" and that it had consistently declined to decide abstract questions of law "where our conclusions could not be made effective by final judgment, decree, and process" (emphasis added), and to Washington-Detroit Theatre Co v Moore, 249 Mich 673, 680-682; 229 NW 618 (1930), where in upholding the constitutionality of the amended declaratory judgment law, this Court declared:
When an actual controversy exists between parties, *467 it is submitted in formal proceedings to a court, the decision of the court is binding upon the parties and their privies and is res adjudicata of the issue in any other proceeding in court in which it may be involved, what else can the decision be but the exercise of judicial power?
* * *
Whether consequential relief be granted upon the original or a subsequent petition, and whether an order of enforcement be had of course or on application, go merely to the practice, not to the power of the court.
* * *
So the court has the authority to grant the relief necessary to end the controversy and to enforce its judgment by appropriate means where compulsion is necessary, it would seem sufficient. No reasonable test of judicial power can demand that the judgment must carry unwarranted or unnecessary relief or process of enforcement. [Emphasis added.]
In the instant case, the response to the certified question will not determine the controversy. No binding order or judgment will be entered. The response will not be made effective by a final judgment, decree or process of this Court. No decision of this Court that will be binding on the parties or that will be res judicata of an issue will be entered by the Court. The response does not end the controversy, and this Court has no way of enforcing its response to the certified question by appropriate means.
The certified question does not ask, nor does the response of the majority state, whether the judgment of the trial court shall be affirmed or reversed. The application of the response to the certified question in Bankey v Storer Broadcasting Co is, again, left to the judgment of the United *468 States Court of Appeals or the United States District Court on remand.[14]
It might be possible to develop a procedure akin to a declaratory judgment whereby this Court's response is determinative of the cause. But there would still be the problem, unless the federal court were to relinquish[15] and this Court assume jurisdiction, that this Court could not, as in the case of a declaratory judgment, enforce its determination by issuing an order or judgment which this Court said, in sustaining in Washington-Detroit Theatre Co the declaratory judgment procedure, was an essential ingredient of the exercise of judicial power.[16]
It appears that because the response to the certified question in the instant case would not be determinative of the cause or controversy and, even if it were, the response cannot be enforced through an order or judgment of this Court, that the response to this certified question is not the exercise of judicial power but closer to an advisory opinion.
The 1908 Constitution did not authorize this Court to issue advisory opinions. The 1963 Constitution authorizes the Court to provide the Legislature or the Governor with an advisory opinion. *469 This provision was recommended to the Constitutional Convention by Chief Judge ROBERT DANHOF, as Chairman to the Committee on Judicial Branch, who said that the provision was "recommended for the purpose of empowering the supreme court to furnish advisory opinions to the governor and each house of the legislature on important questions of law and solemn occasions." 1 Official Record, Constitutional Convention 1961, p 1480.[17] (Emphasis added.)
Advisory opinions are not precedentially binding under the doctrine of stare decisis.[18]
The Court indeed has the power under the constitution to prescribe rules respecting practice and procedure,[19] but it cannot expand the "judicial power" beyond its rightful scope in the guise of a rule prescribing practice and procedure.[20]
*470 It was observed by Justice Frankfurter before he became an advocate of the certified question procedure as a panacea to the increasingly unworkable abstention doctrine:[21]
Advisory opinions are rendered upon sterilized and mutilated issues.
* * *
It must be remembered that advisory opinions are not merely advisory opinions. They are ghosts that slay. [Frankfurter, A note on advisory opinions, 37 Harv L R 1002, 1006, 1008 (1924).]
I acknowledge that this Court has responded to a number of certified questions[22] and that I have participated therein without recognizing the problems adverted to today.[23]
*471 It is nevertheless apparent that the certification question rule, MCR 7.305(B), and policy is in need of further consideration by this Court.[24]
The United States Supreme Court has not recommended the adoption of a procedure that would permit state courts to certify questions of federal law to a federal court, and is unlikely to bend the United States Constitution to permit a federal court to respond to a certified question.[25] Nor may this state's constitution be bent to achieve comity[26] or to accommodate the federal courts[27] however much we might, if it were a personal matter, be desirous of doing so.
NOTES
[1] See 425 Mich 1202 (1986).
[2] We have been provided copies of the briefs and appendix filed with the United States Court of Appeals for the Sixth Circuit. Neither the record nor the issues presented there are before us, except for the certified question.
[3] We use the term "handbook exception" to refer to an employer's written policy statements applicable to the work force in general or to specific classifications of the work force, rather than to an individual employee.
[4] In their joint request for oral argument filed with this Court, the parties stated that "following this Court's decision in Toussaint ..., uncertainty has existed for both employers and employees as to an employer's right to change its written policy statements. The certified question here presents for this Court an opportunity to clarify an important aspect of Michigan employment contract law, as well as to provide practical guidance and certainty for Michigan employers and employees."
[5] Lynas v Maxwell Farms, 279 Mich 684, 687; 273 NW 315 (1937).
[6] Toussaint, supra, p 598.
[7] Id.
[8] In Ebling v Masco Corp, 408 Mich 579; 292 NW2d 880 (1980), a companion case decided in the same opinion as Toussaint, the employee claimed that his discharge violated an oral employment agreement which permitted discharge only for cause. He testified that Masco told him that if he was "doing the job" he would not be discharged.
[9] Id., pp 598-599.
[10] According to the Reporter's note, definitions of unilateral and bilateral contracts were not included in the Second Restatement of Contracts, "because of doubt as to the utility of the distinction...." Restatement Contracts, 2d, Reporter's Note, § 1, p 8. Nevertheless, as one commentator sees it, unilateral contract theory has not only persisted, its use by appellate courts has increased, particularly in employment dispute cases. See Pettit, Modern unilateral contracts, 63 Bost U L R 551, 560 (1983).
[11] Bankey argues that the provisions of 1941 PA 238, MCL 566.1; MSA 26.978(1), setting out the limitations on contractual modifications of agreements concerning real or personal property, should be applied in this case. While a federal district court has recently found this provision to be applicable to employment contracts, Small v Chemlawn Corp, 584 F Supp 690, 692-693 (WD Mich, 1984), aff'd 765 F2d 146 (CA 6, 1985), we decline to address the question of its general applicability to employment contracts at this time. We find only that the provision is inapplicable to discharge-for-cause obligations arising solely under Toussaint.
[12] Hoffman-LaRoche, Inc v Campbell, 512 So 2d 725 (Ala, 1987); Leikvold v Valley View Community Hosp, 141 Ariz 544; 688 P2d 170 (1984); Chambers v Valley Nat'l Bank, 3 IER Cases 1476 (Ariz, 1988); Cleary v American Airlines, 111 Cal App 3d 443; 168 Cal Rptr 722 (1980); Brooks v Trans World Airlines, Inc, 574 F Supp 805 (D Colo, 1983) (applying Colorado law); Continental Air Lines, Inc v Keenan, 731 P2d 708 (Colo, 1987); Lincoln v Sterling Drug, Inc, 622 F Supp 66 (D Conn, 1985) (applying Connecticut law); Green v Howard Univ, 134 US App DC 81; 412 F2d 1128 (1969); Kinoshita v Canadian Pacific Airlines, 724 P2d 110 (Hawaii, 1986); Watson v Idaho Falls Consolidated Hosp, Inc, 111 Idaho 44; 720 P2d 632 (1986); Duldulao v St Mary of Nazareth Hosp Ctr, 115 Ill 2d 482; 505 NE2d 314 (1987); Allegri v Providence-St Margaret Health Ctr, 9 Kan App 2d 659; 684 P2d 1031 (1984); Wyman v Osteopathic Hosp of Maine, Inc, 493 A2d 330 (Me, 1985); Staggs v Blue Cross of Maryland, Inc, 61 Md App 381; 486 A2d 798 (1985), cert den 303 Md 295; 493 A2d 349 (1985); Toussaint, supra; Pine River State Bank v Mettille, 333 NW2d 622 (Minn, 1983); Morris v Lutheran Medical Ctr, 215 Neb 677; 340 NW2d 388 (1983); Southwest Gas Corp v Ahmad, 99 Nev 594; 668 P2d 261 (1983); Woolley v Hoffman-LaRoche, Inc, 99 NJ 284; 491 A2d 1257 (1985), modified on other grounds 101 NJ 10; 499 A2d 515 (1985); Forrester v Parker, 93 NM 781; 606 P2d 191 (1980); Weiner v McGraw-Hill, Inc, 57 NY2d 458; 457 NYS2d 193; 443 NE2d 441 (1982). But see Sabetay v Sterling Drug, Inc, 69 NY2d 329; 514 NYS2d 209; 506 NE2d 919 (1987); Bolling v Clevepak Corp, 20 Ohio App 3d 113; 484 NE2d 1367 (1984); Smith v Teledyne Industries, Inc, 578 F Supp 353 (ED Mich, 1984) (applying Ohio law); Langdon v Saga Corp, 569 P2d 524 (Okla Ct App, 1976) (severance pay); Vinyard v King, 728 F2d 428 (CA 10, 1984) (applying Oklahoma law); Yartzoff v Democrat-Herald Publishing Co, 281 Or 651; 576 P2d 356 (1978); Wolk v Saks Fifth Ave, 728 F2d 221 (CA 3, 1984) (applying Pennsylvania law); Small v Springs Industries, Inc, 292 SC 481; 357 SE2d 452 (1987); Osterkamp v Alkota Mfg, Inc, 332 NW2d 275 (SD, 1983); Hamby v Genesco, Inc, 627 SW2d 373 (Tenn App, 1981). But see Bringle v Methodist Hosp, 701 SW2d 622 (Tenn App, 1985); Smith v Kerrville Bus Co, Inc, 709 F2d 914 (CA 5, 1983) (applying Texas law). But see Reynolds Mfg Co v Mendoza, 644 SW2d 536 (Tex Civ App, 1982); Piacitelli v Southern Utah State College, 636 P2d 1063 (Utah, 1981) (educational institutions); Sherman v Rutland Hosp, 146 Vt 204; 500 A2d 230 (1985); Benoir v Ethan Allen, Inc, 147 Vt 268; 514 A2d 716 (1986); Barger v General Electric Co, 599 F Supp 1154 (WD Va, 1984) (applying Virginia law); Thompson v Kings Entertainment Co, 653 F Supp 871 (ED Va, 1987) (applying Virginia law); Thompson v St Regis Paper Co, 102 Wash 2d 219; 685 P2d 1081 (1984); Ferraro v Koelsch, 124 Wis 2d 154; 368 NW2d 666 (1985); Mobil Coal Producing, Inc v Parks, 704 P2d 702 (Wyo, 1985).
[13] See Leikvold, Wyman, Morris, and Ferraro, n 12 supra, in which the handbook on which the claim was based was handed to or discussed with the plaintiff before or at hiring. See also Wyman, Vinyard, and Sherman, n 12 supra, in which the employee had been required to sign a writing indicating that the employee had read and understood the provisions of the handbook.
[14] See, for example, Chambers, Lincoln, Duldulao, Pine River, Hoffman-LaRoche, Langdon, Vinyard, and Woolley, n 12 supra.
[15] Leikvold, n 12 supra.
[16] Subsequently, the Missouri Supreme Court expressly rejected a handbook exception to the employment-at-will doctrine. Johnson v McDonnel Douglas, 745 SW2d 661 (Mo, 1988).
[17] Our answer might be different, for example, if the employer's change in policy purported to affect employee benefits already accrued or "vested." In such cases, an employee's expectation that changes in policy for the future will not affect entitlements already vested or accrued finds support in our case law. See, for example, Psutka v Michigan Alkali Co, 274 Mich 318; 264 NW 385 (1936) (pensions and death benefits), Gaydos v White Motor Corp, 54 Mich App 143; 220 NW2d 697 (1974) (severance pay), and Clarke v Brunswick Corp, 48 Mich App 667; 211 NW2d 101 (1973) (severance pay). As this Court observed in Ottawa Co v Jaklinski, 423 Mich 1, 26; 377 NW2d 668 (1985), "the concept of `accrued or vested rights' cannot be stretched to include the right not to be discharged except for just cause."
[1] Toussaint does not require that personnel policies and practices remain static. Employers have a legitimate expectation that they will be able to prospectively alter employment policies to respond to changes in the economy or to implement new business strategies. The principal and overriding concept of Toussaint is that an employer cannot act to defeat an employee's legitimate expectations arising from the employer's statements of policy. Id., 599.
[2] The provisions of an employee manual may not, in a particular case, be terms of the employment contract, whether bilateral or unilateral. In Bullock v Automobile Club of Michigan, 146 Mich App 711; 381 NW2d 793 (1985), the Court of Appeals affirmed the decision of the circuit judge denying summary disposition for AAA because it was for the trier of fact to decide whether the provisions of the manual relied on by AAA were consistent with the terms of the offer and acceptance and a part of Bullock's employment contract.

Where the employment contract arises from the terms of a policy statement set forth in a manual, the terms of the employment contract will change as the terms of the policy manual are changed, subject to the legitimate expectations of a particular employee grounded in a policy statement under which he worked. Where there is no express contract and the employee relies on a manual stating a policy that employees will have a job as long as they do the job, then the contract obtains, subject to legitimate expectations, only as long as the employer has such a policy or until he changes it. The principle of promissory estoppel may be applicable where an employee, in reliance on a policy statement, leaves or refuses other employment.
Where, however, the employment contract arises not from statements in a policy manual but from an express contract or representation, a change in policy cannot change the contract because the contract is not based on a policy statement but on express agreement or a representation. If an employee accepts an offer of employment as long as the employee does the job, the contract is that he will be employed as long as he does the job because the contract arose out of an express agreement.
[3] Requiring that "reasonable notice of [a] change [revoking a discharge-for-cause policy] must be uniformly given to affected employees" (ante, p 457) protects legitimate expectations of employees who worked under a just-cause policy, but, depending on how the "reasonable notice" concept is applied, may do so inadequately in particular cases.

Since the notice is to be given "uniformly," it may be contended that a middle-aged employee who worked for twenty years under the discharge-for-cause policy is entitled to no more notice than a young entry-level employee who has worked for one month before the change in policy.
The purpose to be served by providing notice is unclear. Most employees to whom job security may be important do not have the desire, mobility or ability to conduct a search for a discharge-for-cause employer during even a generous "reasonable notice" time span, especially if the employee does not expect that the employer may be considering discharging the employee after the "reasonable notice" expires.
Although an employer is not required to adopt a discharge-for-cause policy and has the right to change such a policy whether or not he reserved the right to do so, if he has adopted such a policy, he has promised more to employees who served under the discharge-for-cause policy than reasonable notice of a change in policy. The legitimate expectations of particular employees grounded in the discharge-for-cause policy may require some other relief or remedy.
[4] preliminary and central question of what the terms of the employment contract in fact are is clearly a question for the trier of fact, a jury where one has been requested. Contract interpretation may present a question of law. Once the trier of fact has determined what are the terms of the employment contract, the separate question of what legitimate employee expectations were generated by employer policy statements found to be a part of the contract is a question of law for the Court. [Bullock, supra, p 507. (Opinion of LEVIN, J.)]
[5] Cf. Allen v Duffie, 43 Mich 1; 4 NW 427 (1880).
[6] Ante, p 457.
[7] It would be better to refrain from expressing views before such briefing. It requires, however, a majority to ask for additional briefing.
[8] 397 Mich lxxix (1976), adopting GCR 1963, 797, now MCR 7.305(B).
[9] Const 1963, art 6, § 1.
[10] Const 1963, art 6, § 4.
[11] The Supreme Court of Utah said:

This Court has never defined the term "appellate jurisdiction" as it is used in Article VIII, Section 4 of the Utah Constitution, but there are ample authorities defining the term as used in other constitutions. In two cases concerning its jurisdiction to issue a writ of habeas corpus, the United States Supreme Court defined "appellate jurisdiction" as "the revision of a decision of an inferior court." Ex parte Bollman [8 US] (4 Cranch) 75, 101; 2 L Ed 554 (1807) (Marshall, C.J.); Ex parte Watkins [32 US] (7 Pet) 568, 573; 8 L Ed 786 (1833) (Story, J). Interpreting its constitution, the Oklahoma Supreme Court stated: "Appellate jurisdiction is that power and jurisdiction to review and correct those proceedings of inferior courts. .. ." Other state courts have made nearly identical comments concerning the meaning of "appellate jurisdiction" in their constitutions.
"Appellate jurisdiction" obviously connotes review of the action of an inferior court. "Inferior court" has been appropriately defined as "any court subordinate to the chief appellate tribunal in the particular judicial system." Federal courts are not "inferior courts" to this Court. Consequently, this Court's answer to a certified question in a case that originated in or is to be adjudicated in a federal court is not an exercise of "appellate jurisdiction" within the meaning of the Utah Constitution. [Emphasis in original.]
To be sure the Supreme Court of Utah, in distinguishing the decisions of other courts recognizing a power to respond to a certified question, observed that its constitution granted it "appellate jurisdiction only," while the constitutions of the other states did not include the limiting "only." The Constitution of 1908, in describing the jurisdiction of this Court, after referring to the power of general superintending control and to issue writs of various kinds stated, "[i]n all other cases it shall have appellate jurisdiction only." Const 1908, art 7, § 4. The omission of the word "only" might be regarded as significant if the Legislature had passed a statute, as have some state legislatures, authorizing this Court to respond to certified questions. It is not questionable, however, whether the Michigan Legislature could constitutionally enact such legislation, since the Michigan Constitution provides that this Court shall have "appellate jurisdiction as provided by rules of the supreme court." (Emphasis added.)
The question thus remains: What is meant by "appellate jurisdiction?" It appears rather clear that appellate jurisdiction does not include responding to a certified question, because in responding to a certified question, the Court is not reviewing, revising, or correcting the proceedings or decisions of an inferior court.
[12] In re Richards, 223 A2d 827, 833 (Me, 1966).

In subsequent cases, the Supreme Judicial Court of Maine stated that "`[d]eterminative of the cause' encompasses any disposition by which the Federal controversy is terminated." Hiram Ricker & Sons v Students Int'l Meditation Society, 342 A2d 262, 264 (Me, 1975) (emphasis in original); White v Edgar, 320 A2d 668 (Me, 1974).
[13] The Uniform Certification of Questions of Law Act speaks, in § 1, of "questions of law of this state which may be determinative of the cause then pending in the certifying court...." 12 ULA 52. It appears that by rule or statute a majority of the states have adopted this formulation. 12 ULA, 1989 Cumulative Annual Pocket Part, p 18.
[14] See Hayburn's Case, 2 US (2 Dall) 409; 1 L Ed 436 (1792); Chicago & Southern Air Lines v Waterman SS Corp, 333 US 103, 113-114; 68 S Ct 431; 92 L Ed 568 (1948), declining to adjudicate where the "decision" would be subject to revision or review by the executive. There the conflict respecting the nature of judicial power arose out of the doctrine of separation of powers, here it arises out of federalism.

The United States Supreme Court approved a declaratory judgment procedure where the case was "finally determined by the judgment below." (Emphasis added.) Nashville, C & S L R Co v Wallace, 288 US 249, 264; 53 S Ct 345; 77 L Ed 730 (1933).
[15] Generally the parties are in federal court because that is where one or both of them want and have a right to be. See Meredith v Winter Haven, 320 US 228, 236-238; 64 S Ct 7; 88 L Ed 9 (1943). There may be irreconcilable conflict between their rights, limitations inherent in a federal system and the nature of judicial power.
[16] See n 14.
[17] By amendment this was limited to the constitutionality of Legislature.

Either house of the legislature or the governor may request the opinion of the supreme court on important questions of law upon solemn occasions as to the constitutionality of legislation after it has been enacted into law but before its effective date. [Const 1963, art 3, § 8.]
[18] Advisory Opinion on Constitutionality of 1975 PA 227, 396 Mich 465; 242 NW2d 3 (1976); Cassidy v McGovern, 415 Mich 483; 330 NW2d 22 (1982), "modified" on other grounds DiFranco v Pickard, 427 Mich 32, 58; 398 NW2d 896 (1986).

The concept that an opinion without an order adjudicating a controversy is not precedentially binding has been recognized in the decisions of this Court and of other courts stating that an advisory opinion is not precedentially binding. "[T]he court does not act as a court in rendering such opinions"; "such opinions are regarded as expressing the views of the justices and not a judicial determination of the questions by the court." Anway v Grand Rapids R Co, 211 Mich 592, 603; 179 NW 350 (1920). [Riley v Northland Geriatric Center, 425 Mich 668, 686; 391 NW2d 331 (1986) (opinion of LEVIN, J.).]
[19] Const 1963, art 6, § 5.
[20] The Supreme Court of Florida said, in conclusory terms, that the Florida rule, restating a Florida statute, was a "valid exercise of our organic power" and spoke of "inherent power" but concluded that in responding to a certified question it was exercising the judicial power. Sun Ins Office, Ltd v Clay, 133 So 2d 735, 741-742 (Fla, 1961). (This was the seminal case on remand from a United States Court of Appeals at the suggestion of the United States Supreme Court in Clay v Sun Ins Office, Ltd, 363 US 207, 212; 80 S Ct 1222; 4 L Ed 2d 1170 [1960].)

The Constitution confers on this Court the judicial power, not organic or inherent power. No organic or inherent power, not within the scope of the judicial power, may rightfully be exercised by any court consistent with the Constitution.
[21] 17A Wright, Miller & Cooper, Federal Practice & Procedure (2d ed), § 4248, pp 158-160.
[22] See Burton Drywall, Inc v Kaufman, 402 Mich 366; 263 NW2d 249 (1978); Mathis v Interstate Freight, 408 Mich 164; 289 NW2d 708 (1980); In re Certified Question (Air Products & Chemicals, Inc v J F Cavanaugh Co, Inc), 411 Mich 727; 311 NW2d 731 (1981); In re Certified Question (Ford Motor Co v Lumbermens Mutual Casualty Co), 413 Mich 22; 319 NW2d 320 (1982); In re Certified Question (Wickersham v John Hancock Mutual Life Ins Co), 413 Mich 57; 318 NW2d 456 (1982); In re Certified Questions (Karl v Bryant Air Conditioning Co), 416 Mich 558; 331 NW2d 456 (1982).
[23] This is not the first time that we have had difficulty in responding to a certified question. See In re Certified Question (Jewell Theatre Corp v Oakland Co Prosecutor), 420 Mich 51; 359 NW2d 513 (1984), where this Court, after agreeing to respond, declined to answer the question certified; In re Certified Questions (Odgers v Ortho Pharmaceutical Corp), 419 Mich 686; 358 NW2d 873 (1984), where the Court responded that there was no rule of law in Michigan that would answer the questions and declined to decide the questions and to state a rule of law.

In other cases we have been able to do so. See In re Certified Question (Duffey v Foltz), 425 Mich 457; 390 NW2d 620 (1986).
See Boyter v Comm'r of Internal Revenue, 668 F2d 1382, 1385 (CA 4, 1981), where the court declined to certify a question.
[24] The subject matter is extensively considered in 17A Wright, Miller & Cooper, Federal Practice & Procedure (2d ed), § 4248, pp 157-179.

See Committee of Federal Courts Analysis of state laws providing for certification by federal courts of determinative state issues of law, 42 The Record 101, 125 (1987), where the following conclusion is stated:
Because of the increasing availability of certification procedures, federal courts are likely to be faced more often with the question of whether to exercise their discretion to certify determinative, unsettled questions of state law. In the past, federal courts have chosen, and wisely we believe, to certify questions in relatively few cases. While the procedure can be useful in a rare case, we believe it would in most cases merely add to the time and expense of resolving disputes and frustrate litigants who are properly before the federal courts.
[25] The United States Supreme Court has, however, approved and encouraged certification by federal courts to state courts Clay v Sun Ins Office, Ltd, n 20 supra; Lehman Bros v Schein, 416 US 386, 390-391; 94 S Ct 1741; 40 L Ed 2d 215 (1974); Elkins v Moreno, 435 US 647, 668; 98 S Ct 1338; 55 L Ed 2d 614 (1978).
[26] See Sun Ins Office, Ltd v Clay, n 20 supra at 741.
[27] Id.